## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**Case No. _____**

**REBECCA LARA**, individually and as
Personal Representative of the
Estate of Gisele Lara,

      Plaintiff,

v.

**BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA**
(including Columbus State University);
**MICHAEL NEWBREY**, individually;
**LAURA BENNETT**, individually, and
**SARAH SECOY**, individually,

      Defendants.

_____/

## <u>COMPLAINT</u>

Rebecca Lara files this lawsuit individually and as Personal Representative of

the Estate of Gisele Lara, to secure a full measure of justice as allowed under federal

law based in light of the death of her daughter who was brutally murdered on campus

while enrolled as a student at Columbus State University by classmate, Nate Janik.

Gisele's death was preventable but for the defendants' failure to reasonably

respond to reports of Janik's stalking, abuse, intimidation, and sexual harassment,

and the defendants' gender-based discrimination and other violations prohibited

under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).

## INTRODUCTION

1. This is a civil rights case involving the tragic, avoidable, and untimely death of Gisele Lara, a 21-year-old biology major at Columbus State University ("MS. LARA"), who was shot and brutally murdered by a classmate, Nate Janik ("JANIK"), on the Columbus State University ("CSU") campus. This preventable murder occurred as a direct result of CSU's failure to reasonably respond to multiple concerning reports of stalking, abuse, intimidation, sexual harassment, gender-based discrimination and other dangerous and abusive behaviors prohibited under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) and 42 U.S.C. § 1983.

2. Despite the fact that MS. LARA and her boyfriend, Matthew Gilbert ("MR. GILBERT") reported that JANIK had raped and was currently stalking MS. LARA, and that they were classmates in the same educational program at CSU, neither her professor, the Title IX coordinator, campus law enforcement, nor any named Defendant took any action reasonably calculated to end the abuse, prevent its reoccurrence or escalation, or to otherwise investigate the allegations, thereby acting with deliberate indifference and subjecting MS. LARA to further and ongoing abuse.

3. The defendants left MS. LARA to deal with her rapist in the classroom setting on her own, which resulted with her death, on campus, immediately following a class she was obligated to share with her rapist and soon-to-be murder.

4. CSU's response to the reports of abuse was clearly unreasonable considering the information it received, and its deliberate indifference to that information ultimately deprived MS. LARA of her access to an education and resulted in MS. LARA's predictable, preventable and tragic death.

5. Pursuant to the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act"), 20 U.S.C. § 1092(f), "dating violence" is "committed by a person who is or has been in a social relationship of a romantic or intimate nature with the victim" to include sexual or physical abuse or the threat of such abuse. It also includes "stalking," which is defined as "a course of conduct directed at a specific person that would cause a reasonable person to – [f]ear for his or her safety or the safety of others; or [s]uffer substantial emotional distress."

6. The Clery Act defines a "course of conduct" to "mean[] two or more acts, including, but not limited to, acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with a person's property." 34 C.F.R. § 668.46.

7. MS. LARA and JANIK shared classes together, but whatever the nature and extent of that relationship, it ended in the Summer of 2023 when JANIK raped her.

8. Domestic violence, dating violence, and other forms of sexual harassment are widespread and serious problems on university campuses and throughout the United States, which disproportionately affect women and often have deadly consequences. According to the National Coalition Against Domestic Violence (NCADV), approximately 90% of sexual assault victims on college campuses knew their attacker. And 35% of those victims reported that the rape occurred while on a date. Other NCADV Domestic Violence on College Campuses Statistics include: 25% of female students experience sexual assault over the course of their college career; 53% of victims of domestic violence were abused by a current or former boyfriend or girlfriend; 21% of college students report having experienced dating violence by a current partner; 32% of college students experienced dating violence by a previous partner; 13% of college women report they were forced to have sex by a dating partner; 60% of acquaintance rapes on college campuses occur in casual or steady dating relationships; and 13% of college women report they have been stalked – nearly half of those were by a current or ex-boyfriend.

9. According to the Centers for Disease Control ("CDC"), which conducted a National Intimate Partner and Sexual Violence Survey (NISVS): about 41% of women and 26% of men experienced contact sexual violence, physical violence, or stalking by an intimate partner during their lifetime and reported a related impact;

and over 61 million women and 53 million men have experienced psychological aggression by an intimate partner in their lifetime.

10. The CDC also states that data from U.S. crime reports suggest that about one in five homicide victims are killed by an intimate partner and that the reports also found that over half of female homicide victims are killed by a current or former male intimate partner.

11. Three quarters of the abusers who ultimately killed their partners engaged in stalking of the intimate partners before killing them. In addition to stalking, several other factors are known to significantly increase the risk of violence or death at the hands of an intimate partner and such factors are commonly evaluated to assess the danger for those at risk. Such factors include, but are not limited to: a short courtship, extreme jealousy, isolation from friends or family, attempts to monitor or control daily activities, stalking, substance abuse, chronic unemployment, access to a gun, prior instances of domestic violence or dating violence, threats to harm or kill the victim, threats of suicide from the abuser, forced sex, manipulative behavior, visions of grandiosity, profound narcissism, lies about military service, bravery or heroism, exaggerated fear of danger associated with the outside world or any attempt by the victim to end the relationship. In fact, danger to the victim drastically increases when a victim leaves an abuser, remains extremely high for three months, dips slightly for the next nine months and drops off precipitously after one year.

## GEORGIA STATE AND UNIVERSITY POLICIES REGARDING STALKING, SEXUAL MISCONDUCT, AND DATING VIOLENCE

12. At all material times, Georgia had a state statutory scheme to curtail stalking. Pursuant to O.C.G.A. § 16-5-90(a)(1), a

> person commits the offense of stalking when he or she follows, places under surveillance, or contacts another person at or about a place or places without the consent of the other person for the purpose of harassing and intimidating the other person……The term 'contact' shall mean any communication including without being limited to communication in person, by telephone, by mail, by broadcast, by computer, by computer network or by and other electronic device; and the place or places that contact by telephone, mail, broadcast, computer, computer network, or any other electronic device is deemed to occur shall be the place or places where such communication is received. For the purpose of this article, the term 'place or places' shall include any public or private property occupied by the victim other than the residence of the defendant. For the purposes of this article, the term 'harassing and intimidating' means a knowing and willful course of conduct directed at a specific person which causes emotional distress by placing such person in reasonable fear for such person's safety…, by establishing a pattern of harassing and intimidating behavior, and which serves no legitimate purpose. This Code section shall not be construed to require that an overt threat of death or bodily injury has been made.

13. Pursuant to O.C.G.A. § 16-5-94(a), a "person who is not a minor who alleges stalking by another person may seek a restraining order by filing a petition alleging conduct constituting stalking as defined in Code Section 16-5-90." Subsection (b) of § 16.5.94 provides, upon the filing of a verified petition alleging specific facts that probable cause exists to establish that stalking by the respondent has occurred in the past and may occur in the future, the court may order such

temporary relief *ex parte* as it deems necessary to protect the petitioner from stalking.

14. The BOARD OF REGENTS' Policy Manual, at page 60, provides that upon notice of alleged Sexual Misconduct, the institution's (here, CSU) Title IX Coordinator ("Coordinator") will assess whether a formal investigation, informal resolution, or dismissal would be appropriate. The Policy Manual at page 62 provides "[i]nterim measures may be implemented at any point after the institution becomes aware of an allegation of Sexual Misconduct and should be designed to protect any student or other individual in the USG community." "Such measures are designed to restore or preserve equal access to the education program…without unreasonably burdening the other party, including measures designed to protect the safety of all parties or the recipient's educational environment, or deter Sexual Misconduct and retaliation."

15. In determining whether to make an "interim suspension" of a respondent, the Policy Manual provides that "should only occur where necessary to promote safety and should be limited to those situations where the Respondent poses a serious and immediate danger or threat to persons or property." "In making such an assessment, the institution should consider the existence of a significant risk to the health or safety of the Complainant or the campus community; the nature, duration,

and severity of the risk; the probability of potential injury; and whether less restrictive means can be used to significantly mitigate the risk."

16. However, the Policy Manual at page 62 provides "[b]efore an interim suspension is issued, the institution must make reasonable effort to give the Respondent the opportunity to be heard on whether the Respondent's presence on campus poses a danger. If an interim suspension is issued, the terms of the interim suspension take effect immediately."

17. The Policy Manual, at page 63, states that "the parties shall be provided with written notice of the report/allegations with sufficient details, pending investigation, possible charges, possible sanctions, available support services and interim measures, and other rights under applicable institutional policies." Upon receipt of the written notice, the "parties shall have at least three business days to respond in writing." Throughout the process, the Complainant and Respondent have the right to present witnesses and other inculpatory and exculpatory evidence. And "[a]n investigator shall conduct a thorough investigation…." An initial investigation report is to be provided to Complainant and Respondent, but the Policy Manual states no deadline for provision of that report. Complainant and Respondent have ten calendar days to review and respond to the report in writing. The investigator reviews their responses, if any, and then issues a final investigation report, which

must be provided to Complainant and Respondent at least ten calendar days prior to the hearing.

18. The BOARD OF REGENTS' Policy Manual at page 85 defines "Dating Violence" as "[v]iolence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the alleged victim. The existence of such a relationship shall be determined based on the totality of the circumstances including, without limitation to: (1) the length of the relationship; (2) the type of relationship; and (3) the frequency of interaction between the persons involved in the relationship. Dating violence includes, but is not limited to, sexual or physical abuse or the threat of such abuse. Dating violence does not include acts covered under the definition of Domestic Violence."

19. The BOARD OF REGENTS' Policy Manual at page 87 defines "Sexual Harassment (Student on Student)" as "[u]nwelcome verbal, nonverbal, or physical conduct based on sex (including gender stereotypes), determined by a Reasonable Person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to participate in or to benefit from an institutional education program or activity."

20. Page 86 of the Policy Manual defines Reasonable Person as "[a]n individual who is objectively reasonable under similar circumstances and with similar identities to the person being evaluated by the institution."

21. The BOARD OF REGENTS Policy Manual defines "Sexual Misconduct" to "[i]nclude[] but [be] not limited to, such unwanted behavior as dating violence, domestic violence, nonconsensual sexual contact, nonconsensual sexual penetration, sexual exploitation, sexual harassment and stalking."

22. The BOARD OF REGENTS Policy Manual defines "Stalking" as "[e]ngaging in a course of conduct directed at a specific person that would cause a reasonable person to fear for their safety or the safety of others or suffer substantial emotional distress. For purposes of this definition: (1) [c]ourse of conduct means two or more acts, including, but not limited to, acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with person's property; (2) substantial emotional distress means significant mental suffering or anguish that may but does not necessarily, require medical or other professional treatment or counseling."

23. The BOARD OF REGENTS Policy Manual, at page 91, provides for "Emergency Removal" "where necessary to maintain safety and should be limited to those situations where the Respondent poses a serious and immediate danger or threat to persons or property. In making such an assessment, the institution should consider the existence of a significant risk to the health or safety of the Complainant or the campus community; the nature, duration, and severity of the risk; the

10

probability of potential injury; and whether less restrictive means can be used to significantly mitigate the risk.

24. CSU also had a formal Sexual Misconduct Policy. Effective August 13, 2020, as stated in its "Sexual Misconduct Policy," on page 1, CSU, as a member of the University System of Georgia, "prohibits discrimination on the basis of sex in any of its education programs or activities…." It stated that "CSU is committed to ensuring the highest ethical conduct of the members of its community by promoting a safe learning and working environment. To that end, this Policy prohibits Sexual Misconduct, a form of sex discrimination, as defined herein.

25. CSU's Sexual Misconduct Policy, at page 1, further stated

CSU is committed to reducing incidents of Sexual Misconduct, providing prevention tools, conducting ongoing awareness and prevention programming, and training the campus community in accordance with the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act") and the Violence Against Women Act ("VAWA"). Prevention programming and training will promote positive and healthy behaviors and educate the campus community on consent, sexual assault, sexual harassment, alcohol and drug use, dating violence, domestic violence, stalking, bystander intervention, and reporting.

26. CSU's Sexual Misconduct Policy, on page 2, provided

[w]hen Sexual Misconduct does occur, all members of the CSU community are strongly encouraged to report it promptly through the procedures outlined in this Policy. The purpose of this Policy is to ensure due process and compliance addressing sexual misconduct. This Policy is not intended to infringe or restrict rights guaranteed by the United States Constitution including free speech under the First

11

Amendment, or the due process clause of Fifth and Fourteenth Amendments.

27. CSU's Sexual Misconduct Policy, on pages 2-5, provides definitions of Dating Violence, Sexual Harassment (Student on Student), Sexual Misconduct, and Stalking, which mirror the BOARD OF REGENTS' definitions.

28. CSU's Sexual Misconduct Policy, on page 5, "encourages the reporting of all Sexual Misconduct as soon as possible." An institutional report occurs when the institution (CSU) has notice of a complaint. That notice occurs in two instances: (1) when a Responsible Employee receives a complaint, or when the Title IX Coordinator, stated to be Sarah Secoy, or their designee receives a complaint.

29. CSU's Sexual Misconduct Policy, on page 6, provides the Title IX Coordinator, upon receipt of an institutional report, will contact the Complainant, and discuss the availability of supportive measures, invite the Complainant to discuss their wishes with respect to implementation of supportive measures, and explain the process of filing a complaint. The Title IX Coordinator shall notify the System Director of any allegations of Sexual Misconduct that could, standing alone as reported, lead to the suspension, or expulsion of the Respondent. The System Director will work with the institution to determine whether any support services or interim measures are necessary and to assign an investigator(s) who will work under the direction of the System Director or designee, if directed by System Director.

30. CSU's Sexual Misconduct Policy, on page 8, provides

[o]nce the Title IX Coordinator has received information regarding an allegation of Sexual Misconduct, the parties will be provided written information about support services. Support services are non-disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, and without charge that are made available to the parties before or after the filing of a complaint or where no complaint has been, or will be, filed. Support services include counseling, advocacy, housing assistance, academic support, disability services, health and mental services, and other services, available at CSU and the surrounding area. Available support services are listed on the Title IX website.

31. CSU's Sexual Misconduct Policy, on page 8-9, provides:

Interim measures may be implemented at any point after the institution becomes aware of an allegation of Sexual Misconduct and should be designed to protect any individual in the CSU or USG communities. Such measures are designed to restore or to preserve equal access to the education program or activity without unreasonably burdening either party, including measures designed to protect the safety of all parties or the campus community or to deter Sexual Misconduct and Retaliation. Interim measures must be provided consistent with the provisions in applicable USG and CSU policies and procedures.

32. CSU's Sexual Misconduct Policy, on page 9, provides for Emergency Removal which

should only occur where necessary to maintain safety and should be limited to those situations where the Respondent poses a serious and immediate danger or threat to persons or property. In making such an assessment, the institution should consider the existence of a significant risk to the health or safety of the Complainant or the campus community; the nature, duration, and severity of the risk; the probability of potential injury; and whether less restrictive means can be used to significantly mitigate the risk.

33. CSU's Sexual Misconduct Policy, on page 10, states the "Title IX regulations require special handling of complaints of sexual harassment," as

compared to sexual misconduct. CSU further states under Title IX "Sexual Harassment" is defined to satisfy (1) "Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the institution's education program or activity; or (2) "Sexual Assault" as defined by the Clery Act and "dating violence," "domestic violence," and "stalking" as defined by the VAWA Amendments and provided in III above."

## A PREVENTABLE CAMPUS MURDER

34. MS. LARA's death arose from a set of circumstances that should have alerted BOARD OF REGENTS, THE STATE OF GEORGIA, DR. NEWBREY, MS. SECOY, and/or LAURA BENNETT (the then-Chief of CSU Police) (a/k/a CHIEF BENNETT)—with sufficient time to take action—that one of their students was in extreme peril of being seriously harmed or killed as a result of sexual harassment, sexual misconduct, dating violence, or stalking on campus by another CSU student. Despite direct reports to CSU of sexual harassment, sexual misconduct, and stalking levied by JANIK upon MS. LARA, the Defendants made no investigation, developed no plans, and implemented no efforts to take any meaningful action reasonably calculated to end the harassment or to otherwise prohibit JANIK from having ongoing access to CSU's campus and MS. LARA.

35. On or about August of 2022, MS. LARA started attending classes at CSU. She majored in biology. She was originally from California and wanted to attend college out of state.

36. MS. LARA and JANIK were classmates at CSU. They were both biology students conducting research on the same species of fish under Dr. Michael Newbrey ("DR. NEWBREY"). During the summer of 2023, they participated in fish research trips conducted by DR. NEWBREY, a professor in the Department of Biology. Based on information and belief, DR. NEWBREY texted JANIK pictures of MS. LARA on a CSU fishing boat, and that MS LARA and others might be joining him on a fishing trip.

37. At some time during the summer of 2023, JANIK raped MS. LARA.

38. After the rape, MS. LARA attempted to distance herself from JANIK, but his advances continued.

39. According to MS. LARA's boyfriend, MR. GILBERT, MS. LARA started to refer to JANIK as "creepy" towards the end of the summer.

40. Prior to the start of the Fall 2023 Semester, CSU students picked research groups for their Ichthyology class. This was a class comprised of approximately 15 students, and the students would be working in small research groups of approximately three students throughout the semester.

41. MS. LARA indicated she would be in the "Large Mouth Bass" research group.

42. Prior to the start of classes, MS. LARA learned JANIK wanted to be in the same research group.   MS. LARA was concerned about this, and MS. LARA began to communicate with Dr. NEWBREY.

43. In August 2023, MS. LARA, was in her senior year at CSU.

44. In August 2023, MS. LARA had just accepted a position as a Biology Research CSU employee and was beginning the process of applying to biology PhD programs.

45. At a family barbeque in California in early August 2023, MS. LARA confided in her uncle that JANIK was following her around at school, harassing her and "creeping [her] out."

46. Her uncle encouraged her to report JANIK to the school, and MS. LARA told her uncle she would report him.

47. MS. LARA reported JANIK to DR. NEWBREY in person on Monday, Aug. 14, 2023.

48. On Monday, August 14, 2023, the first day of the Fall semester classes, MS. LARA again notified DR. NEWBREY that she could not work in a group with JANIK because he had been harassing her, making her feel uncomfortable and unsafe.

49. Afterwards, MS. LARA informed MR. GILBERT, her boyfriend, that she had met with DR. NEWBREY about JANIK.

50. MS. LARA told MR. GILBERT that DR. NEWBREY had promised to ensure that JANIK would be "nowhere near [her]," and that DR. NEWBREY was making JANIK switch his research focus to Pan Fish as opposed to the Large Mouth Bass MS. LARA was researching.

51. JANIK followed MS. LARA to her car after class on Tuesday August 15th.

52. On the morning of Wednesday, August 16, 2023, per a CSU police report, a security camera showed JANIK stalking MS. LARA.

53. That morning, MS. LARA had a male Teacher Assistant escort her to class due to her fear of JANIK.

54. That day, MR. GILBERT met MS. LARA for lunch on campus.

55. Over lunch, MS. LARA told MR. GILBERT that JANIK was scaring her and that she was uncomfortable being around him in class.

56. At around noon, MS. LARA and MR. GILBERT went to speak to DR. NEWBREY again about JANIK's conduct.

57. Once again, MS. LARA notified DR. NEWBREY that she did not feel comfortable being around JANIK or working on a research project with him.

58. MS. LARA reported to DR. NEWBREY that JANIK had raped and/or sexually assaulted her previously.

59. MS. LARA also told DR. NEWBREY that JANIK was continuing to stalk and sexually harass her.

60. After MS. LARA's meeting, MR. GILBERT spoke to DR. NEWBREY alone to make it clear, again, that JANIK had raped MS. LARA and to ensure that DR. NEWBREY would report all information about the matter to the Title IX office.

61. At 5:47 p.m. that evening, DR. NEWBREY submitted a "Create Care" report. According to CSU's website, this form is used for reporting, among other things, threatening behavior.

62. That same evening, DR. NEWBREY texted MS. LARA, stating: "I can see you were really upset today. I was worried about you the rest of the day."

63. DR. NEWBREY's report appears to have been routed to Dana Larkin, Assistant Dean of Students.

64. The report also appears to have been copied to Title IX Coordinator Sara Secoy ("MS. SECOY"), University Chief of Police Laura Bennett, Lt. Wendy Brundage, and all Campus Security Officials with authority to act immediately.

65. However, no one at CSU took any actions to ensure MS. LARA received interim supportive measures or to implement or develop a plan for safety measures to protect MS. LARA on August 16, 2023, or at any time thereafter.

66. On the morning of August 17, 2023, MS. SECOY sent MS. LARA a form email suggesting MS. LARA could schedule a meeting with MS. SECOY about Mr. Newbrey's report.

67. MS. SECOY's email demonstrated no sense of urgency despite the fact DR. NEWBREY had flagged the situation as "Critical."

68. Although MS. SECOY noted in her email to MS. LARA that support services may be available, MS. SECOY did not explain what those supportive measures were or what supportive measures were available to MS. LARA.

69. MS. SECOY did not schedule a meeting with MS. LARA.

70. The meeting times MS. SECOY offered to MS. LARA all conflicted with MS. LARA's class schedule.

71. In meetings with MS. LARA's family after MS. LARA's murder, MS. SECOY falsely stated MS. SECOY's email had contained links with more information. The email produced to MS. LARA's family did not contain any links or even phone numbers for the Title IX office, or the CSU Police Department.

72. On the evening of Thursday, August 17, 2023, as MS. LARA was leaving her ecology lab section, JANIK followed her to her car. His threatening behavior included banging on her car window.

73. JANIK was not a student or participant in MS. LARA's ecology lab.

74. The fact JANIK knew when and where MS. LARA's ecology class was located demonstrated JANIK was surveilling MS. LARA and that the threat to MS. LARA's safety was escalating.

75. MS. LARA was so distressed about JANIK's behavior, she was terrified to go to class on Friday, August 18, 2023.

76. For some reason, DR. NEWBREY gave JANIK notice of MS. LARA's requests for accommodations and safety measures, likely upsetting JANIK.

77. MS. SECOY and/or other CSU representatives also gave JANIK notice of MS. LARA's requests for accommodations and safety measures, which were likely upsetting JANIK.

78. Shortly before class began on Friday, August 18, 2023, another student witnessed MS. LARA and JANIK having an altercation and noted that they had stepped outside the class.

79. Based on information and belief, on or about August 18, 2023 at 9:00 a.m., DR. NEWBREY observed MS. LARA and JANIK outside of a class building having altercation but continued walking to his classroom.  He did not intervene or request campus police.

80. Based on information and belief, another CSU employee witnessed Ms. LARA and JANIK having heated verbal altercation outside classes between Lenoir and Stanley Hall but chose not report.

81. Both MS. LARA and JANIK returned to class five minutes late, and according to DR. NEWBREY, they "appeared distressed."

82. DR. NEWBREY reported that JANIK was "wide-eyed," which had immediately caught DR. NEWBREY's attention.

83. DR. NEWBREY believed that MS. LARA and JANIK appeared upset.

84. Another student, with initials M.A., reported that JANIK was repeatedly looking back at MS. LARA throughout the class.

85. MS. LARA wrote notes during class stating, "Ignore him[;] I'll fill you in later. He went from a nice guy to a weirdo overnight."

86. JANIK told MS. LARA he would "kill himself in front of the whole class."

87. JANIK was verbally harassing MS. LARA, demanding "that she needed to date him."

88. After class ended, JANIK followed MS. LARA as she exited the classroom.

89. JANIK pursued MS. LARA to her car in the school parking lot where he confronted her with his firearm and levied accusations that she had been cheating on him.

90. MS. LARA repeatedly asked JANIK to "stop" and "leave her alone."

91. JANIK then shot and killed MS. LARA as she sat in her vehicle after which he shot and killed himself. These events (their conversation and the murder) were captured in an audio file MS. LARA recorded on her cellular telephone.

92. This lethal behavior was consistent with his stalking, unwanted advances, and delusions they were dating, and were part of the hostile and deadly educational learning environment that MS. LARA was forced to endure.

93. Witnesses interviewed as part of the subsequent investigation made it clear JANIK had actual knowledge that MS. LARA had reported the sexual harassment and/or rape and that JANIK retaliated against MS. LARA by murdering her out of anger and/or fear of the consequences that he might face as a result of her report.

94. The students that called 911 after shootings were directed by dispatch operator to administer life saving measures as MS. LARA was moaning and breathing, but as a student was unbuckling the seatbelt from MS. LARA, CSU police officers ordered that student to move away.

95. When responding to the scene of the shooting, CSU campus police found MS. LARA still breathing and gasping for air.

96. CSU campus police unreasonably and deliberately prevented paramedics from examining MS. LARA, or attempting to provide any life-saving measures and/or medical treatment to MS. LARA.

97. The BOARD OF REGENTS' Policy Manual and CSU's Sexual Misconduct Policy both explained the warning signs associated with sexual harassment and sexual misconduct and that manual and policy permitted Emergency Removal of JANIK.

98. Defendants, MICHAEL NEWBREY, SARAH SECOY, and WENDY BRUNDAGE should have been able to recognize the warning signs associated with JANIK's abusive behavior and should have known how Mr. Lara could avoid personal attacks.

99. CSU and the BOARD OF REGENTS also failed to adequately train its employees to recognize the warning signs of abusive behavior.

100. CSU and BOARD OF REGENTS failed to plan, implement and train its employees to respond to crisis and emergency management events.

101. CSU and BOARD OF REGENTS failed to maintain a campus with adequate safety for campus students and employees to utilize in the event of an emergency/attacker. For instance, there were no BLUE LIGHT call posts or cameras anywhere near the long path that MS. LARA was pursued and killed.

102. CSU failed to conduct an investigation "in a manner that [was] transparent to [MS.LARA, after HER murder, Rebecca Lara, executor of Gisele's estate]." 34 C.F.R. § 668.46(k)(3)(i)(B)(1); 20 U.S.C. § 1092(f)(8)(B)(vi).

## JURISDICTION

103. This action arises, in part, under Title IX of the Education Amendments of 1972 20 U.S.C. §§1681, et seq. and, accordingly, this Court has original subject matter jurisdiction under 28 U.S.C. §1331.

104. This action also arises, in part, under 42 U.S.C. §1983 and, accordingly, this Court has original subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3-4) and 42 U.S.C. §§ 1983 and 1988(a).

## PARTIES AND VENUE

105. Plaintiff, Rebecca Lara, brings this suit as an individual plaintiff and also as personal representative for the estate of her daughter, Gisele Lara, the decedent, for purposes of pursuing all available survival and wrongful death damages.

106. Rebecca Lara is a citizen and resident of California and was so at all times relevant to this action.

107. Her daughter, MS. LARA, was killed by JANIK, a fellow Columbus State University ("CSU") student, on August 18, 2023.

108. CSU is located in Muscogee County, Georgia, within this district.

109. Defendant, the BOARD OF REGENTS of the University System of Georgia, is located at 270 Washington St., SW, Atlanta, Georgia 30334 ("BOARD OF REGENTS"), and has governing, administrative authority, and control over the University System of Georgia, including CSU, its agents and/or employees. The

BOARD OF REGENTS, as the governing body exercising control over the University of Georgia, is a proper named Defendant to this matter. MS. LARA's injuries and death occurred as the direct and proximate result of the negligence of Columbus State University, its employees and/or its agents subject to the supervision, authority, and control of the BOARD OF REGENTS.

110. The BOARD OF REGENTS requires service at the office of Vice Chancellor Legal Affairs of the BOARD OF REGENTS, Christopher McGraw, at University System of Georgia Headquarters, 270 Washington St., SW, Fulton County, Atlanta, Georgia 30334 or, alternatively, Chancellor Dr. Sonny Perdue at the same address.

111. Regarding the State of Georgia, pursuant to O.C.G.A. § 50-21-35, Plaintiff will serve Gwen Middleton, Executive Business Operations Manager, and the Risk Management Services Director Designee for service of process for actions brought against the State, by serving her at 200 Piedmont Ave., SE, West Tower, Suite 1804, Fulton County, Atlanta, Georgia 30334.

112. Pursuant to O.C.G.A. § 50-21-35, Plaintiff will also provide a copy of the Complaint, showing the date of filing, to the Attorney General, Chris Carr, at his usual office address of 40 Capital Square, SW, Fulton County, Atlanta, Georgia 30334, by certified mail, return receipt requested.

113. Defendant Michael Newbrey ("DR. NEWBREY") is an adult Georgia resident, who, at all material times, was a professor at Columbus State University, and who, based on information and belief, resides in Muscogee County, Georgia.

114. Defendant SARAH SECOY ("MS. SECOY") is an adult Georgia resident, who, at all material times, was the Title IX Compliance Coordinator at Columbus State University, and who, based on information and belief, resides in Muscogee County, Georgia.

115. The Chief of CSU Police at the time of the murder was LAURA BENNETT ("CHIEF BENNETT"). She is believed to still reside in Muscogee County, Georgia.

116. Per 28 U.S.C. § 1391(a-b), venue is proper "in a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located[.]". Further, under LR 3.1(B)(1)(a), NDGa, if defendants in a civil action "live in different divisions, the action may be brought in any division in which one (1) defendant resides." And per LR 3.1(B)(1)(b), NDGa, any "such action against two (2) or more defendants residing in different districts within the State of Georgia may be brought against all defendants in any division of this district where at least one defendant resides."

117. Muscogee County, Georgia, is in the Middle District of Georgia in the Columbus Division. (See Middle District Local Rule 3.1 and attached map). Fulton

County is located in the Northern District of Georgia, Atlanta Division. Therefore, venue would be proper in either the Northern or Middle Districts of Georgia, and Plaintiff has elected to file in the Northern District, Atlanta Division.

118. All conditions precedent to the filing of this suit have been performed, complied with, or otherwise waived or satisfied.

### COUNT I – DELIBERATE INDIFFERENCE UNDER TITLE IX
(As to Defendants BOARD OF REGENTS of the
University System of Georgia, State of Georgia)

119. Plaintiff, REBECCA LARA, as Personal Representative of the Estate of GISELE LARA, and individually, realleges paragraphs 1 through 118 as if fully stated herein.

120. The BOARD OF REGENTS receives federal financial assistance and funding, which it doles out to State of Georgia universities, including but not limited to CSU. Therefore, the BOARD OF REGENTS is subject to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX").

121. The BOARD OF REGENTS, through CSU, and CSU through DR. NEWBREY, MS. SECOY, and CHIEF BENNETT, had actual knowledge and actual notice that JANIK had raped MS. LARA, and was stalking, sexually harassing, abusing, intimidating and otherwise harming and threatening MS. LARA on the basis of her sex.

122. The BOARD OF REGENTS, through CSU, and CSU through DR. NEWBREY, MS. SECOY, and CHIEF BENNETT, had actual knowledge and actual notice that should have been sufficient to alert them to the possibility that MS. LARA was a victim of sexual harassment including the threat and likelihood of sexual or physical violence.

123. The majority of stalking, abuse, intimidation, dating violence, sexual harassment and other abuse and ultimately the murder occurred on campus under the operation of the BOARD OF REGENTS', through CSU's programs.

124. Moreover, actual knowledge or notice of the stalking, abusing, intimidating, sexually harassing, and levying gender-based discrimination upon MS. LARA was obtained by the appropriate persons from BOARD OF REGENTS' member university, CSU, including but not limited to DR. NEWBREY, Title IX Coordinator MS. SECOY, and CHIEF BENNETT.

125. These officials individually and jointly exercised substantial control over activities occurring on the CSU campus and over people such as JANIK, a CSU student. Indeed, the BOARD OF REGENTS, and CSU's policies regarding sexual harassment applied to students, including MS. LARA and JANIK. Accordingly, these officials had the authority and ability to take appropriate and timely remedial action to end the harassment by, among other things:

28

a.    enforcing BOARD OF REGENTS' policies and procedures contained in its Policy Manual;

b.    enforcing CSU's Sexual Misconduct policies and procedures contained in CSU's Sexual Misconduct Policy document effective August 13, 2020;

c.    advising MS. LARA of her rights to seek an immediate injunction against Mr. Lara to prevent him from coming within a close proximity to her; the likelihood whether that would be an effective deterrent against JANIK, and if not, any other measures MS. LARA may have been entitled to and advised to take to stop JANIK's actions from escalating;

d.    removing JANIK from campus through the BOARD OF REGENTS' and CSU's "Emergency Removal" procedure;

e.    causing CSU's campus police to pick up, detain, and interview JANIK, and potentially bring in non-campus police for determination whether to arrest JANIK or to have him sent for mental health evaluation;

f.    causing CSU's campus police and/or non-campus police to immediately serve a warrant upon JANIK to search JANIK's residence for weapons, including guns;

29

g.   causing CSU's campus police and/or non-campus police to contact and interview JANIK's family members, friends, and fellow classmates for information concerning MS. LARA's allegations;

h.   contacting and coordinating with other CSU departments, organizations or teams, including but not limited to the CARE team, S.A.V.E. (Sexual Assault and Violence Education) team, or any behavioral intervention department;

i.   providing referrals to victim advocacy and/or counseling services;

j.   investigating the allegations made against JANIK;

k.   providing academic adjustments;

l.   imposing no-contact directives;

m.   providing security escorts;

n.   providing other safety and protective measures;

o.   providing educational training;

p.   reviewing or revising CSU's policies or practices, particularly in regard to alerting the accused before any security steps are taken and in regard to the extreme delays in response time built in to the response plan; and/or

q.    considering broader remedial action.

126. Despite this authority, the BOARD OF REGENTS and its member university, CSU, took no action to the point that it constituted deliberate indifference, which left MS. LARA to be chased to her car and shot to death on CSU's campus.

127. The BOARD OF REGENTS, through its member university CSU, was deliberately indifferent to the ongoing stalking, abusing, intimidating, sexually harassing, and levying gender-based discrimination occurring on CSU's campus and specifically directed towards one of its female students, and its response to the information that it had received about MS. LARA's situation was clearly unreasonable in light of the known circumstances, ultimately resulting in MS. LARA's brutal murder.

128. Indeed, despite having the ability and authority to do so, the BOARD OF REGENTS, through its member university, CSU, failed to investigate the allegations against JANIK and deliberately failed to take any action that was reasonably calculated to end the escalating stalking, abusing, intimidating, sexually harassing, and levying gender-based discrimination, thereby exposing MS. LARA and making her more vulnerable to—and subjecting her to further—stalking, abusing, intimidating, sexually harassing, and levying gender-based discrimination and

creating a hostile educational environment in which MS. LARA felt unsafe and was in fact unsafe on campus, and which ultimately resulted in her brutal murder.

129. The stalking, abusing, intimidating, sexually harassing, and levying gender-based discrimination was so severe, pervasive, clearly unreasonable, and objectively offensive that it deprived MS. LARA of access to educational opportunities and benefits during her life and upon her murder.

130. To the extent the BOARD OF REGENTS and/or CSU officials or other appropriate persons who had the ability and authority to take remedial action obtained knowledge within the course and scope of their employment or agency relationship with the BOARD OF REGENTS and/or CSU, such knowledge is imputed to the BOARD OF REGENTS and to CSU, and to other BOARD OF REGENTS/CSU officials or other appropriate persons at the BOARD OF REGENTS/CSU who had the ability and authority to take remedial action.

131. The BOARD OF REGENTS is independently liable for action that it took or failed to take in light of the knowledge that was imputed to it through its officials or through the appropriate persons who had the ability and authority to take remedial action.

132. The BOARD OF REGENTS' actions showed willful misconduct, malice, fraud, wantonness, oppression, and/or an entire want of care which would raise the presumption of conscious indifference to consequences.

133. As a direct and foreseeable consequence of the above-pled misconduct, MS. LARA was stalked, harassed, shot, and then killed.

134. As a further direct and foreseeable consequence of the above-pled misconduct, Plaintiff is entitled to all damages allowable under law, such as:

    a.  in a survival action, including but not limited to those for MS. LARA's pre-death physical and mental pain and suffering, in addition to punitive damages;

    b.  in a wrongful death action, including but not limited to the full value of MS. LARA's life in both its economic value (e.g., medical expenses, funeral/burial expenses, lost income and earning potential, lost educational opportunities, loss of household services, etc.) and the value of other non-economic intangible things that she would have attained or experienced through the end of her life had she lived) without deducting for any of the necessary or personal expenses of the decedent had she lived, as well as punitive damages;

    c.  for loss of REBECCA LARA's relationship with her daughter, MS. LARA, the decedent, including but not limited to emotional loss, mental pain and suffering, the absence of love, society, care, guidance, companionship, counsel, association, comfort, and support, as well as punitive damages;

    d.  reasonable and related expenses associated with this lawsuit;

    e.  attorneys' fees, 28 U.S.C. § 1988; and,

    f.  pre- and/or -post-judgment interest.

WHEREFORE, Plaintiff, REBECCA LARA, as Personal Representative of the Estate of Gisele Lara, and individually, seek entry of a judgment against the BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA for Deliberate Indifference within the meaning of Title IX.

### COUNT II – DELIBERATE INDIFFERENCE – VIOLATION OF TITLE IX
#### (As to DR. NEWBREY)

135. Plaintiff, Rebecca Lara, as Personal Representative of the Estate of Gisele Lara, and individually, realleges paragraphs 1 through 118 as if fully stated herein.

136. The BOARD OF REGENTS receives federal financial assistance and funding, which it doles out to State of Georgia universities, including but not limited to CSU. Therefore, the BOARD OF REGENTS is subject to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX").

137. DR. NEWBREY had actual knowledge and actual notice that JANIK had raped MS. LARA, and was stalking, sexually harassing, abusing, intimidating and otherwise harming and threatening MS. LARA on the basis of her sex.

138. DR. NEWBREY had actual knowledge and actual notice that should have been sufficient to alert him to the possibility that MS. LARA was a victim of sexual harassment including the threat and likelihood of further sexual or physical violence.

139. The majority of stalking, abuse, intimidation, dating violence, sexual harassment and ultimately the murder itself occurred on the CSU campus under the operation of the BOARD OF REGENTS' educational programs.

140. Moreover, actual knowledge or notice of the stalking, abusing, intimidating, sexually harassing, and levying gender-based discrimination by JANIK upon MS. LARA was obtained by the appropriate persons from BOARD OF REGENTS' member university, CSU, including but not limited to DR. NEWBREY.

141. DR. NEWBREY exercised substantial control over activities occurring on the CSU campus and over people such as JANIK, a CSU student. Indeed, the BOARD OF REGENTS, and CSU's policies regarding sexual harassment applied to students, including MS. LARA and JANIK. DR. NEWBREY had the authority and ability to take appropriate and timely remedial action to end the harassment by, among other things:

      a. enforcing BOARD OF REGENTS' policies and procedures contained in its Policy Manual;

b. enforcing CSU's Sexual Misconduct policies and procedures contained in CSU's Sexual Misconduct Policy document effective August 13, 2020;

c. advising MS. LARA of her rights to seek an immediate injunction against Mr. Lara to prevent him from coming within a close proximity to her; the likelihood whether that would be an effective deterrent against JANIK, and if not, any other measures MS. LARA may have been advised to take to stop JANIK's actions from escalating;

d. seeking removal of JANIK from campus through the BOARD OF REGENTS' and CSU's "Emergency Removal" procedure;

e. causing CSU's campus police to pick up, detain, and interview JANIK, and potentially bring in non-campus police for determination whether to arrest JANIK or to have him sent for mental health evaluation;

f. causing CSU's campus police and/or non-campus police to immediately serve a warrant upon JANIK to search JANIK's residence for weapons, including guns;

g. causing CSU's campus police and/or non-campus police to contact and interview JANIK's family members, friends, and fellow classmates for information concerning MS. LARA's allegations;

36

h. contacting and coordinating with other CSU departments, organizations or teams, including but not limited to the CARE team, S.A.V.E. (Sexual Assault and Violence Education) team, or any behavioral intervention department;

i. providing referrals to victim advocacy and/or counseling services;

j. investigating the allegations made against JANIK;

k. providing academic adjustments;

l. imposing no-contact directives;

m. providing security escorts;

n. providing other safety and protective measures;

o. providing educational training;

p. reviewing or revising CSU's policies or practices, particularly in regard to alerting the accused before any security steps are taken and in regard to the extreme delays in response time built in to the response plan; and/or,

q. considering broader remedial action.

142. DR. NEWBREY had a duty to respond to reports or observations of stalking, abuse, intimidation, domestic violence, dating violence, sexual harassment, and/or gender-based discrimination between his students.

143. Despite this authority, DR. NEWBREY took little or no action to the point that it constituted deliberate indifference, which left MS. LARA to be chased to her car, and shot to death on CSU's campus.

144. DR. NEWBREY was deliberately indifferent to the ongoing stalking, abusing, intimidating, sexually harassing, and levying gender-based discrimination occurring on CSU's campus and specifically directed towards one of its female Latina STEM students, and its response to the information that he had received about MS. LARA's situation was clearly unreasonable in light of the known circumstances, ultimately resulting in MS. LARA's brutal murder.

145. In 2023, Gisele Lara and JANIK were both biology students conducting research on the same species of fish.

146. During the summer of 2023, they participated in fish research trips conducted by a professor in the Department of Biology, DR. NEWBREY.

147. At some time during the summer of 2023, JANIK raped MS. LARA.

148. After the rape, MS. LARA attempted to distance herself from JANIK, but his advances continued.

149. Prior to the start of the Fall 2023 Semester, CSU students picked research groups for their Ichthyology class. This was a class of approximately 15 students, and students would be working in small research groups of approximately three students throughout the semester.

150. MS. LARA chose the "Large Mouth Bass" research group.

151. Prior to the start of classes, MS. LARA learned JANIK wanted to be in the same research group.

152. In August 2023, MS. LARA, was in her senior year at CSU.

153. In August 2023, MS. LARA had just accepted a position as a Biology Research CSU employee and was beginning the process of applying to biology PhD programs.

154. MS. LARA reported JANIK to DR. NEWBREY in person on Monday, Aug. 14, 2023 after her 9:00am Ecology Class.

155. On Monday, August 14, 2023, the first day of the Fall semester classes, MS. LARA again notified DR. NEWBREY that she could not work in a group with JANIK because he had been harassing her, making her feel uncomfortable and unsafe.

156. Afterwards, MS. LARA informed MR. GILBERT, her boyfriend, that she had met with DR. NEWBREY about JANIK.

157. MS. LARA told MR. GILBERT, her boyfriend, that DR. NEWBREY had promised to ensure that JANIK would be "nowhere near [her]," and that DR. NEWBREY was making JANIK switch his research focus to Pan Fish as opposed to the Large Mouth Bass MS. LARA was researching.

158.  The next day August 15th, JANIK followed MS. LARA to her car.

159. On the morning of Wednesday, August 16, 2023, per a CSU police report, a security camera showed JANIK stalking MS. LARA.

160. That morning, MS. LARA had a male Teacher Assistant escort her to class due to her fear of JANIK.

161. MR. GILBERT met MS. LARA for lunch on campus.

162. Over lunch, MS. LARA told MR. GILBERT that JANIK was scaring her and that she was uncomfortable being around him in class.

163. At around noon, MS. LARA and MR. GILBERT went to speak to DR. NEWBREY again about JANIK's conduct.

164. MS. LARA met with DR. NEWBREY alone while MR. GILBERT waited outside DR. NEWBREY's office.

165. Once again, MS. LARA notified DR. NEWBREY she did not feel comfortable being around JANIK or working on a research project with him.

166. MS. LARA reported to DR. NEWBREY JANIK had raped and/or sexually assaulted her previously.

167. MS. LARA also told DR. NEWBREY that JANIK was continuing to stalk and sexually harass her.

168. After MS. LARA's meeting, MR. GILBERT spoke to DR. NEWBREY alone to make it clear, again, that JANIK had raped MS. LARA and to ensure that DR. NEWBREY would report all information about the matter to the Title IX office.

169. At 5:47 p.m. that evening, DR. NEWBREY submitted a "Behavioral Concern/Create Care" report. According to CSU's website, this form is used for reporting, among other things, threatening behavior.

170. DR. NEWBREY marked the urgency level as "Critical."

171. That same evening, DR. NEWBREY texted MS. LARA, stating: "I can see you were really upset today. I was worried about you the rest of the day."

172. DR. NEWBREY intentionally gave notice of MS. LARA's requests for accommodations and safety measures to JANIK.

173. Shortly before class began on Friday, August 18, 2023, another student witnessed MS. LARA and JANIK having an altercation and noted that they had stepped outside the class.

174. Both MS. LARA and JANIK returned to class five minutes late, and according to DR. NEWBREY, who was teaching that class, they "appeared distressed."

175. DR. NEWBREY did not take action to remove JANIK from the class or contact campus security despite his knowledge of both the history between MS. LARA and JANIK, despite having sent a "critical" report two days  prior.  and despite promising that JANIK would be nowhere near her, and despite seeing evidence of current argument unfolding outside (On campus video) and inside the classroom that caused MS. LARA to enter the classroom late.

176. DR. NEWBREY reported JANIK was "wide-eyed," which had immediately caught DR. NEWBREY's attention.

177. DR. NEWBREY testified that both MS. LARA and JANIK appeared upset.

178. DR. NEWBREY had the opportunity, ability, authority, and obligation to intervene, but he did nothing to contact campus security or otherwise intervene in any way. In fact, he intentionally decided to end class early which prevented MS. LARA from placing other students in hallways between her and JANIK like she did on August 16th as stated in CSU Police report by LT Brundage.

179. Another student, M.A., reported that JANIK was repeatedly looking back at MS. LARA throughout the class.

180. MS. LARA wrote notes during class stating, "Ignore him[;] I'll fill you in later. He went from a nice guy to a weirdo overnight."

181. JANIK told MS. LARA that he would "kill himself in front of the whole class."

182. JANIK was verbally harassing MS. LARA, demanding "that she needed to date him."

183. After class ended, JANIK followed MS. LARA as she exited the classroom.

184. JANIK pursued MS. LARA out to her car in the school parking lot, where he confronted her with his firearm and levied accusations that she had been cheating on him.

185. MS. LARA repeatedly asked JANIK to "stop" and "leave her alone."

186. JANIK then shot and killed MS. LARA as she sat in her vehicle, and he shot and killed himself soon after.

187. DR. NEWBREY had adequate notice that he could be liable for the conduct at issue.

188. DR. NEWBREY had authority to take remedial action

189. DR. NEWBREY's deliberate indifference subjected MS. LARA to further harassment and made her more vulnerable to harassment.

190. The majority of the harassment—and the final confrontation and murder—occurred under the operations of CSU and in places and situations subject to CSU's control.

191. The discrimination had the effect of excluding MS. LARA from participation in—and receipt of the benefits—of her education programs and activities on the basis of her gender because the sexual harassment was so severe, pervasive, and objectively offensive, and that it undermined and detracted from MS. LARA's educational experience, denying her equal access to CSU's resources and opportunities.

43

192. As a direct and proximate result of DR. NEWBREY's failure to intervene, MS. LARA suffered injuries, including but not limited to emotional distress, psychological trauma, severe physical harm and death.

193. Plaintiffs seek judgment for, among other things, loss of access to educational opportunities and benefits, tuition and related expenses, personal injuries, pain and suffering, loss of chance, mental anguish, medical expenses, impaired earning capacity, lost wages, household services, the value of services that MS. LARA would have provided, loss of society, comfort, association, love, counsel, care, consortium and protection, loss of the reasonable expectation of REBECCA LARA to associate with her daughter, and other special and general damages; for punitive damages; for permission to amend this Complaint and to add parties and causes of action at a later date consistent with evidence adduced through discovery; for prejudgment interest, for post judgment interest, for the costs of this suit, including attorney's fees and for such further relief as the Court deems proper. Plaintiffs otherwise suffered additional harm and incurred damages as a result of the deprivation of equal protection.

194. Indeed, despite having the ability and authority to do so, DR. NEWBREY deliberately failed to take any action that was reasonably calculated to end the stalking, abusing, intimidating, sexually harassing, and levying gender-based discrimination, thereby exposing MS. LARA and making her more vulnerable to—

and subjecting her to further—stalking, abusing, intimidating, sexually harassing, and levying gender-based discrimination and creating a hostile educational environment in which MS. LARA felt unsafe and was in fact unsafe on campus, and which ultimately resulted in her brutal murder.

195. The stalking, abusing, intimidating, sexually harassing, and levying gender-based discrimination was so severe, pervasive, clearly unreasonable, and objectively offensive that it deprived MS. LARA of access to educational opportunities and benefits during her life and upon her murder.

196. DR. NEWBREY'S actions showed willful misconduct, malice, fraud, wantonness, oppression, and/or an entire want of care which would raise the presumption of conscious indifference to consequences.

197. As a direct and foreseeable consequence of the above-pled misconduct, MS. LARA was stalked, harassed, shot, and then killed.

198. As a further direct and foreseeable consequence of the above-pled misconduct, Plaintiff is entitled to all damages allowable under law, such as:

    a. in a survival action, including but not limited to those for MS. LARA's pre-death physical and mental pain and suffering, in addition to punitive damages;

    b. in a wrongful death action, including but not limited to the full value of MS. LARA's life in both its economic value (e.g., medical expenses,

funeral/burial expenses, lost income and earning potential, lost educational opportunities, loss of household services, etc.) and the value of other non-economic intangible things that she would have attained or experienced through the end of her life had she lived) without deducting for any of the necessary or personal expenses of the decedent had she lived, as well as punitive damages;

c. for loss of REBECCA LARA's relationship with her daughter, MS. LARA, the decedent, including but not limited to emotional loss, mental pain and suffering, the absence of love, society, care, guidance, companionship, counsel, association, comfort, and support, as well as punitive damages;

d. reasonable and related expenses associated with this lawsuit;

e. attorneys' fees, 28 U.S.C. § 1988; and,

f. pre- and/or -post-judgment interest.

WHEREFORE, Plaintiff, REBECCA LARA, as Personal Representative of the Estate of Gisele Lara, and individually, seek entry of a judgment against DR. NEWBREY for Deliberate Indifference within the meaning of Title IX.

### COUNT III – DELIBERATE INDIFFERENCE –
### VIOLATION OF TITLE IX
(As to Sarah Secoy)

199. Plaintiff, Rebecca Lara, as Personal Representative of the Estate of Gisele Lara, and individually, realleges paragraphs 1 through 118 as if fully stated herein.

200. The BOARD OF REGENTS receives federal financial assistance and funding, which it doles out to State of Georgia universities, including but not limited to CSU. Therefore, the BOARD OF REGENTS is subject to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX").

201. On the morning of Wednesday, August 16, 2023, per a CSU police report, a security camera showed JANIK stalking MS. LARA.

202. That morning, MS. LARA had a male Teacher Assistant escort her to class because she felt unsafe from JANIK.

203. Later that day, MR. GILBERT met MS. LARA for lunch on campus.

204. Over lunch, MS. LARA told MR. GILBERT that JANIK was scaring her and that she was uncomfortable being around him in class.

205. At around noon, MS. LARA and MR. GILBERT went to speak to DR. NEWBREY about JANIK's conduct.

206. Once again, MS. LARA notified DR. NEWBREY she did not feel comfortable being around JANIK or working on a research project with him.

207. MS. LARA reported to DR. NEWBREY that JANIK had raped and/or sexually assaulted her previously.

208. MS. LARA also told DR. NEWBREY that JANIK was continuing to stalk and sexually harass her.

209. After MS. LARA's meeting, MR. GILBERT spoke to DR. NEWBREY alone to make it clear, again, that JANIK had raped MS. LARA and to ensure that DR. NEWBREY would report all information about the matter to the Title IX office.

210. At 5:47 p.m. that evening, DR. NEWBREY submitted a "Behavioral Concern/Create Care" report. According to CSU's website, this form is used for reporting, among other things, threatening behavior.

211. DR. NEWBREY marked the report as "Critical," "Reported by Student" and included "Assault/Fighting," "Health/Safety," and "Sexual Misconduct."

212. DR. NEWBREY's report appears to have been routed to Dana Larkin, Assistant Dean of Students.

213. The report also appears to have been copied to Title IX Coordinator Sara Secoy ("MS. SECOY"), CSU Chief of Police Laura Bennett ("CHIEF BENNETT"), Lt. Wendy Brundage of the SCU police, and all Campus Security Officials with authority to act immediately.

214. CSU failed to provide MS. LARA a safe educational environment, retaliated against Gisele and witnesses, including MR. GILBERT and Joy Delta

Flowers, and facilitated Janik's retaliation against Plaintiff. 34 C.F.R. § 668.46(m); 20 U.S.C. §1092(f)(17).

215. CSU failed to provide "prompt, fair, and impartial process[es] from the initial report to the final result" in response to MS. LARA's complaints and subsequent murder. 34 C.F.R. § 668.46 (k)(2)(i); 20 U.S.C. § 1092(f)(8)(B)(iv)(I)(aa).

216. On the morning of August 17, 2023, MS. SECOY sent MS. LARA a form email suggesting MS. LARA could schedule a meeting with MS. SECOY about Mr. Newbrey's report.

217. MS. SECOY's email demonstrated no sense of urgency despite the fact DR. NEWBREY had flagged the situation as "Critical."

218. Although MS. SECOY noted in her email to MS. LARA that support services may be available, MS. SECOY did not explain what supportive measures were or what supportive measures were available to MS. LARA.

219. CSU and MS. SECOY failed to provide MS. LARA written notification of her Civil Rights, applicable disciplinary procedures and policies, available accommodations and protective measures, confidentiality protections, victim services available both on and off campus, or her options to involve or not involve law enforcement. 34 C.F.R. § 668.46(b)(11)(vii); 20 U.S.C. § 1092(f)(8)(C).

49

220. MS. SECOY did not include a RISK ASSESSMENT on TITLE IX Reporting Form.

221. MS. SECOY did not schedule a meeting with MS. LARA.

222. The meeting times MS. SECOY offered to MS. LARA all conflicted with MS. LARA's class schedule.

223. In meetings with MS. LARA's family after MS. LARA's murder, MS. SECOY falsely stated MS. SECOY's email contained links with more information.

224. The email produced to MS. LARA's family did not contain any links or even phone numbers for the Title IX office, or the CSU Police Department.

225. On the evening of Thursday, August 17, 2023, as MS. LARA was leaving her ecology lab section, JANIK chased her to her car.

226. JANIK was not a student or participant in MS. LARA's ecology lab.

227. The fact JANIK knew when and where MS. LARA's ecology class was located demonstrated JANIK was surveilling MS. LARA and that the threat to MS. LARA's safety was escalating.

228. MS. LARA was so distressed about JANIK's behavior, she was terrified to go to class on Friday, August 18, 2023.

229. MS. SECOY and/or other CSU representatives intentionally had given notice of MS. LARA's requests for accommodations and safety measures to JANIK.

MS. SECOY failed to keep Gisele's requests for accommodations and protective measures confidential to the extent possible, 34 C.F.R. § 668.46(b)(11)(iii).

230. On Friday, August 18, 2023, another student witnessed MS. LARA and JANIK having an altercation and noted that they had stepped outside the class.

231. They both were visibly distressed.

232. After class ended, JANIK followed MS. LARA as she exited the classroom.

233. JANIK pursued MS. LARA out to her car in the school parking lot, where he confronted her with his firearm and levied accusations that she had been cheating on him.

234. JANIK then shot and killed MS. LARA as she sat in her vehicle, and he shot and killed himself soon after.

235. Witnesses interviewed as part of the subsequent investigation made it clear that JANIK had actual knowledge that MS. LARA had reported the sexual harassment and/or rape and that JANIK retaliated against MS. LARA by murdering her out of anger and/or fear of the consequences he might face as a result of her report.

236. MS. SECOY had actual knowledge and actual notice that JANIK had raped MS. LARA, and/or was stalking, sexually harassing, abusing, intimidating and otherwise harming and threatening MS. LARA on the basis of her sex.

237. MS. SECOY had actual knowledge and actual notice that should have been sufficient to alert her to the possibility that MS. LARA was a victim of sexual harassment including the threat and likelihood of sexual or physical violence.

238. The majority of stalking, abuse, intimidation, dating violence, sexual harassment—including the final confrontation and murder—occurred on the CSU campus under the operation of the BOARD OF REGENTS' educational programs.

239. Moreover, actual knowledge or notice of the stalking, abusing, intimidating, sexually harassing, and levying gender-based discrimination upon MS. LARA was obtained by the appropriate persons from BOARD OF REGENTS' member university, CSU, including but not limited to MS. SECOY, the Title IX Coordinator.

240. MS. SECOY had a duty to respond to reports or observations of stalking, abuse, intimidation, domestic violence, dating violence, sexual battery, sexual harassment, and/or gender-based discrimination between CSU students.

241. MS. SECOY jointly exercised substantial control over activities occurring on the CSU campus and over people such as JANIK, a CSU student. Indeed, the BOARD OF REGENTS, and CSU's policies regarding sexual harassment applied to students, including MS. LARA and JANIK. Accordingly, these officials had the authority and ability to take appropriate and timely remedial action to end the harassment by, among other things:

a. enforcing BOARD OF REGENTS' policies and procedures contained in its Policy Manual;

b. enforcing CSU's Sexual Misconduct policies and procedures contained in CSU's Sexual Misconduct Policy document effective August 13, 2020;

c. advising MS. LARA of her rights to seek an immediate injunction against Mr. Lara to prevent him from coming within a close proximity to her; the likelihood whether that would be an effective deterrent against JANIK, and if not, any other measures MS. LARA may have been advised to take to stop JANIK's actions from escalating;

d. removing JANIK from campus through the BOARD OF REGENTS' and CSU's "Emergency Removal" procedure;

e. causing CSU's campus police to pick up, detain, and interview JANIK, and potentially bring in non-campus police for determination whether to arrest JANIK or to have him sent for mental health evaluation;

f. causing CSU's campus police and/or non-campus police to immediately serve a warrant upon JANIK to search JANIK's residence for weapons, including guns;

g. causing CSU's campus police and/or non-campus police to contact and interview JANIK's family members, friends, and fellow classmates for information concerning MS. LARA's allegations;

h. contacting and coordinating with other CSU departments, organizations or teams, including but not limited to the CARE team, S.A.V.E. (Sexual Assault and Violence Education) team, or any behavioral intervention department;

i. providing referrals to victim advocacy and/or counseling services;

j. investigating the allegations made against JANIK;

k. providing academic adjustments;

l. imposing no-contact directives;

m. providing security escorts;

n. providing other safety and protective measures;

o. providing educational training;

p. reviewing or revising CSU's policies or practices, particularly in regard to alerting the accused before any security steps are taken and in regard to the extreme delays in response time built in to the response plan; and/or

q. considering broader remedial action.

242. Despite this authority, MS. SECOY took no real action to the point that it constituted deliberate indifference, which left MS. LARA to be chased to her car, and shot to death on CSU's campus.

243. MS. SECOY was deliberately indifferent to the ongoing stalking, abusing, intimidating, sexually harassing, and levying gender-based discrimination occurring on CSU's campus and specifically directed towards one of its female students, and its response to the information that it had received about MS. LARA's situation was clearly unreasonable in light of the known circumstances, ultimately resulting in MS. LARA's brutal murder.

244. MS. SECOY had adequate notice that she could be liable for the conduct at issue.

245. MS. SECOY had authority to take remedial action.

246. MS. SECOY's deliberate indifference subjected MS. LARA to further harassment and made her more vulnerable to harassment.

247. The majority of the harassment occurred under the operations of CSU and in places and situations subject to CSU's control.

248. The discrimination had the effect of excluding MS. LARA from participation in—and receipt of the benefits—of her education programs and activities on the basis of her gender because the sexual harassment was so severe, pervasive, and objectively offensive, and that it undermined and detracted from MS.

55

LARA's educational experience, denying her equal access to CSU's resources and opportunities.

249. Indeed, despite having the ability and authority to do so, MS. SECOY failed to investigate the allegations against JANIK and deliberately failed to take any action that was reasonably calculated to end the stalking, abusing, intimidating, sexually harassing, and levying gender-based discrimination, thereby exposing MS. LARA and making her more vulnerable to—and subjecting her to further—stalking, abusing, intimidating, sexually harassing, and levying gender-based discrimination and creating a hostile educational environment in which MS. LARA felt (and was) unsafe and that ultimately resulted in her brutal murder.

250. The stalking, abusing, intimidating, sexually harassing, and levying gender-based discrimination was so severe, pervasive, clearly unreasonable, and objectively offensive that it deprived MS. LARA of access to educational opportunities and benefits during her life and upon her murder.

251. The MS. SECOY's actions showed willful misconduct, malice, fraud, wantonness, oppression, and/or an entire want of care which would raise the presumption of conscious indifference to consequences.

252. As a direct and foreseeable consequence of the above-pled misconduct, MS. LARA was stalked, harassed, shot, and then killed.

253. As a further direct and foreseeable consequence of the above-pled misconduct, Plaintiff is entitled to all damages allowable under law, such as:

    a.  in a survival action, including but not limited to those for MS. LARA's pre-death physical and mental pain and suffering, in addition to punitive damages;

    b.  in a wrongful death action, including but not limited to the full value of MS. LARA's life in both its economic value (e.g., medical expenses, funeral/burial expenses, lost income and earning potential, lost educational opportunities, loss of household services, etc.) and the value of other non-economic intangible things that she would have attained or experienced through the end of her life had she lived) without deducting for any of the necessary or personal expenses of the decedent had she lived, as well as punitive damages;

    c.  for loss of REBECCA LARA's relationship with her daughter, MS. LARA, the decedent, including but not limited to emotional loss, mental pain and suffering, the absence of love, society, care, guidance, companionship, counsel, association, comfort, and support, as well as punitive damages;

    d.  reasonable and related expenses associated with this lawsuit;

    e.  attorneys' fees, 28 U.S.C. § 1988; and,

    f.  pre- and/or -post-judgment interest.

WHEREFORE, Plaintiffs, REBECCA LARA, as Personal Representative of the Estate of Gisele Lara, and individually, seek entry of a judgment against MS. SECOY for Deliberate Indifference within the meaning of Title IX.

### COUNT IV – VIOLATION OF EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT – 42 U.S.C. § 1983
(As to Defendants DR. NEWBREY, MS. SECOY, and CHIEF BENNETT)

254. Plaintiff, REBECCA LARA, as Personal Representative of the Estate of GISELE LARA, and individually, realleges paragraphs 1 through 118 as if fully stated herein.

255. Defendants DR. NEWBREY, MS. SECOY, and CHIEF BENNETT, as individuals, had a duty to respond to reports of stalking, abuse, intimidation, sexual harassment, and gender-based discrimination against MS. LARA.

256. DR. NEWBREY, MS. SECOY, and CHIEF BENNETT exercised discretion at the moment when they decided how they would respond to reports that JANIK was sexually harassing MS. LARA.

257. The duty to respond and the power to exercise discretion in determining how DR. NEWBREY, MS. SECOY, and CHIEF BENNETT would respond to reports JANIK was stalking, abusing, intimidating, sexually harassing, and discriminating against MS. LARA was possessed by virtue of state law and made possible only because state law vested DR. NEWBREY, MS. SECOY, and CHIEF

BENNETT with the authority to respond to such reports. Accordingly, DR. NEWBREY, MS. SECOY, and CHIEF BENNETT were acting under color of state law when they exercised discretion in determining how they would respond to reports that JANIK was stalking, abusing, intimidating, sexually harassing, and discriminating against MS. LARA.

258. In determining how to exercise their discretion in responding to reports that JANIK was stalking, abusing, intimidating, sexually harassing, and discriminating against MS. LARA, through information and belief, DR. NEWBREY, MS. SECOY, and CHIEF BENNETT based their decisions on irrational gender stereotypes through the mechanical application of traditional, yet inaccurate, assumptions about the nature of men and women and their proper roles in society, including but not limited to gender stereotypes indicating: that women are unreasonable, irrational, hysterical and hypersensitive; that women overact to situations; that women are spiteful; that women report abuse or harassment to get attention; that women have ulterior motives when they report abuse or harassment; that women are often untruthful when they report abuse or harassment; that men often have a legitimate reason for abusing or harassing women; that women often deserve, encourage, provoke or enjoy the harassment or abuse that they report; that women who look or act a certain way are "tramps" or "sluts;" that women send mixed signals to men; that women cannot be trusted and that men are therefore

justified in questioning their fidelity; that men cannot control their primal urges; that women have the power to end harassment or abuse on their own; that a woman who is being harassed or abused will always seek help on their own behalf; that women should be accommodating and subservient to men; that men have the right to exercise authority over women; and/or that women hate men and will take drastic measures to cause them harm.

259. DR. NEWBREY, MS. SECOY, and CHIEF BENNETT classified MS. LARA by her gender and engaged in differential treatment that violated MS. LARA's clearly established right to equal protection under the Fourteenth Amendment of the United States Constitution, thereby acquiescing in the stalking, abuse, intimidation, sexually harassment, and gender-based discrimination, when they were deliberately indifferent to the reports that JANIK was stalking, abusing, intimidating, sexually harassing, and discriminating against MS. LARA.

260. Additionally, or in the alternative, DR. NEWBREY, MS. SECOY, and CHIEF BENNETT classified MS. LARA by her gender and engaged in differential treatment that violated MS. LARA's right to equal protection under the Fourteenth Amendment of the United States Constitution, thereby acquiescing in the stalking, abuse, intimidation, sexually harassment, and gender-based discrimination, when they based their decisions about how to respond to reports that JANIK was stalking, abusing, intimidating, sexually harassing, and discriminating against MS. LARA on

irrational gender stereotypes, thereby dismissing the situation as one involving behavior that is acceptable in the context of a relationship with an intimate partner (which JANIK was not) and employing unacceptable mentalities that blame women for the abuse of men.

261. DR. NEWBREY, MS. SECOY, and CHIEF BENNETT's use of classification based on gender and their differential treatment on the basis of gender was not substantially related to achieving an important governmental interest.

262. DR. NEWBREY, MS. SECOY, and CHIEF BENNETT did not respond to the report of stalking or rape by a male student the way that they would have responded to a claim by a male student of being harassed, attacked, or threatened.

263. The deprivation of equal protection under the law left MS. LARA vulnerable to ongoing stalking, abuse, intimidation, sexual harassment, and gender-based discrimination, indicating that DR. NEWBREY, MS. SECOY, and CHIEF BENNETT silently condoned or acquiesced to JANIK's conduct.

264. The deprivation of equal protection under the law exposed MS. LARA to further incidences of sexual harassment, culminating in the brutal attack that resulted in her murder and a permanent deprivation of her access to education.

265. The actions of the defendants targeted by this Count showed willful misconduct, malice, fraud, wantonness, oppression, and/or an entire want of care which would raise the presumption of conscious indifference to consequences.

266. As a direct and foreseeable consequence of the above-pled misconduct, MS. LARA was stalked, harassed, shot, and then killed.

267. As a further direct and foreseeable consequence of the above-pled misconduct, Plaintiff is entitled to all damages allowable under law, such as:

    a.  in a survival action, including but not limited to those for MS. LARA's pre-death physical and mental pain and suffering, in addition to punitive damages;

    b.  in a wrongful death action, including but not limited to the full value of MS. LARA's life in both its economic value (e.g., medical expenses, funeral/burial expenses, lost income and earning potential, lost educational opportunities, loss of household services, etc.) and the value of other non-economic intangible things that she would have attained or experienced through the end of her life had she lived) without deducting for any of the necessary or personal expenses of the decedent had she lived, as well as punitive damages;

    c.  for loss of REBECCA LARA's relationship with her daughter, MS. LARA, the decedent, including but not limited to emotional loss, mental pain and suffering, the absence of love, society, care, guidance, companionship, counsel, association, comfort, and support, as well as punitive damages;

    d.  reasonable and related expenses associated with this lawsuit;

    e.  attorneys' fees, 28 U.S.C. § 1988; and,

    f.  pre- and/or -post-judgment interest.

WHEREFORE, Plaintiffs, REBECCA LARA, as Personal Representative of the Estate of Gisele Lara, and individually, seek entry of a judgment against DR. NEWBREY, MS. SECOY, and CHIEF BENNETT for violation of MS. LARA's right to Equal Protection guaranteed by the Fourteenth Amendment under 42 U.S.C. § 1983.

### COUNT V – VIOLATION OF EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT – 42 U.S.C. § 1983
(*Monell* Liability As to All Defendants)

268. Plaintiff, REBECCA LARA, as Personal Representative of the Estate of GISELE LARA, and individually, realleges paragraphs 1 through 118 as if fully stated herein.

269. DR. NEWBREY, MS. SECOY, and CHIEF BENNETT, and others, were officials of the BOARD OF REGENTS, and its member university, CSU, with final policy making authority.

270. BOARD OF REGENTS, DR. NEWBREY, MS. SECOY, and CHIEF BENNETT had final policy making authority exercised discretion at the moment when they decided how they would respond to reports that JANIK was stalking,

abusing, intimidating, sexually harassing, and discriminating against MS. LARA on the basis of her gender.

271. The duty to respond and the power to exercise discretion in determining how BOARD OF REGENTS, DR. NEWBREY, MS. SECOY, and CHIEF BENNETT with final policy making authority would respond to reports that JANIK was stalking, abusing, intimidating, sexually harassing, and discriminating against MS. LARA on the basis of her gender was possessed by virtue of state law and made possible only because state law vested such officials with the authority to respond to such reports.

272. Accordingly, BOARD OF REGENTS, DR. NEWBREY, MS. SECOY, and CHIEF BENNETT and CSU officials with final policy making authority were acting under color of state law when they exercised discretion in determining how they would respond to reports that JANIK was stalking, abusing, intimidating, sexually harassing, and discriminating against MS. LARA on the basis of her gender.

273. In determining how to exercise their discretion in responding to reports that JANIK was stalking, abusing, intimidating, sexually harassing, and discriminating against MS. LARA on the basis of her gender, through information and belief, BOARD OF REGENTS, DR. NEWBREY, MS. SECOY, and CHIEF BENNETT had final policymaking authority based their decisions on irrational gender stereotypes through the mechanical application of traditional, yet inaccurate,

assumptions about the nature of men and women and their proper roles in society, including but not limited to gender stereotypes indicating: that women are unreasonable, irrational, hysterical and hypersensitive; that women overact to situations; that women are spiteful; that women report abuse or harassment to get attention; that women have ulterior motives when they report abuse or harassment; that women are often untruthful when they report abuse or harassment; that men often have a legitimate reason for abusing or harassing women; that women often deserve, encourage, provoke or enjoy the harassment or abuse that they report; that women who look or act a certain way are "tramps" or "sluts;" that women send mixed signals to men; that women cannot be trusted and that men are therefore justified in questioning their fidelity; that men cannot control their primal urges; that women have the power to end harassment or abuse on their own; that a woman who is being harassed or abused will always seek help on their own behalf; that women should be accommodating and subservient to men; that men have the right to exercise authority over women; and/or that women hate men and will take drastic measures to cause them harm.

274. BOARD OF REGENTS, DR. NEWBREY, MS. SECOY, and CHIEF BENNETT, the officials with final policymaking authority, classified MS. LARA by her gender and engaged in differential treatment that violated MS. LARA's right to equal protection under the Fourteenth Amendment of the United States

Constitution, thereby acquiescing in the stalking, abuse, intimidation, sexual harassment, and gender-based discrimination, when they were deliberately indifferent to the reports that JANIK was stalking, abusing, intimidating, sexually harassing, and discriminating against MS. LARA.

275. Additionally, or in the alternative, BOARD OF REGENTS, DR. NEWBREY, MS. SECOY, and CHIEF BENNETT, who had final policymaking authority, classified MS. LARA by her gender and engaged in differential treatment that violated MS. LARA's right to equal protection under the Fourteenth Amendment of the United States Constitution, thereby acquiescing in the stalking, abuse, intimidation, sexually harassment, and gender-based discrimination, when they based their decisions about how to respond to reports that JANIK was stalking, abusing, intimidating, sexually harassing, and discriminating against MS. LARA on irrational gender stereotypes, thereby dismissing the situation as one involving behavior that is acceptable in the context of a relationship with an intimate partner (which JANIK was not) and employing unacceptable mentalities that blame women for the abuse of men.

276. Alternatively, even if DR. NEWBREY, MS. SECOY, and CHIEF BENNETT were not officials of BOARD OF REGENTS, including through its member university, CSU, with final policy making authority, their response to the sexual harassment based on irrational gender stereotypes, their use of classification

based on gender, their differential treatment based on the use of classification based on gender, their failure to investigate or otherwise respond to the sexual harassment at issue, their deliberate indifference to the sexual harassment at issue and their failure to implement appropriate policies, practices and procedures that were obviously necessary to address a serious risk of stalking, abusing, intimidating, sexually harassing, and discriminating against MS. LARA on campus, were representative of an official policy or custom of the BOARD OF REGENTS, including through its member university, CSU, and deprived MS. LARA of her constitutional right to equal protection under the Fourteenth Amendment.

277. The use of classification based on gender by the BOARD OF REGENTS, DR. NEWBREY, MS. SECOY, and CHIEF BENNETT and their differential treatment on the basis of gender was not substantially related to achieving an important governmental interest.

278. The deprivation of equal protection under the law left MS. LARA vulnerable to ongoing stalking, abuse, intimidation, sexual harassment, and gender-based discrimination, indicating that BOARD OF REGENTS, DR. NEWBREY, MS. SECOY, and CHIEF BENNETT silently condoned or acquiesced to JANIK's conduct.

279. The deprivation of equal protection under the law exposed MS. LARA to further incidences of sexual harassment, culminating in the brutal attack that resulted in her murder and a permanent deprivation of her access to education.

280. Plaintiffs otherwise suffered additional harm and incurred damages as a result of the deprivation of equal protection.

281. To the extent that employees or agents of BOARD OF REGENTS, and/or its member university, CSU, were officials with final policy making authority, knowledge obtained by such employees or agents within the course and scope of the employment or agency relationship is imputed to the BOARD OF REGENTS and to other CSU officials with final policy making authority.

282. The BOARD OF REGENTS, including through its member university, CSU, is independently liable for action that it took or failed to take in light of the knowledge that was imputed to it through employees or agents of BOARD OF REGENTS and/or CSU who were BOARD OF REGENTS/CSU officials with final policy making authority.

283. The actions of the defendants showed willful misconduct, malice, fraud, wantonness, oppression, and/or an entire want of care which would raise the presumption of conscious indifference to consequences.

284. As a direct and foreseeable consequence of the above-pled misconduct, MS. LARA was stalked, harassed, shot, and then killed.

285. As a further direct and foreseeable consequence of the above-pled misconduct, Plaintiff is entitled to all damages allowable under law, such as:

a. in a survival action, including but not limited to those for MS. LARA's pre-death physical and mental pain and suffering, in addition to punitive damages;

b. in a wrongful death action, including but not limited to the full value of MS. LARA's life in both its economic value (e.g., medical expenses, funeral/burial expenses, lost income and earning potential, lost educational opportunities, loss of household services, etc.) and the value of other non-economic intangible things that she would have attained or experienced through the end of her life had she lived) without deducting for any of the necessary or personal expenses of the decedent had she lived, as well as punitive damages;

c. for loss of REBECCA LARA's relationship with her daughter, MS. LARA, the decedent, including but not limited to emotional loss, mental pain and suffering, the absence of love, society, care, guidance, companionship, counsel, association, comfort, and support, as well as punitive damages;

d. reasonable and related expenses associated with this lawsuit;

e. attorneys' fees, 28 U.S.C. § 1988; and,

f. pre- and/or -post-judgment interest.

WHEREFORE, Plaintiffs, REBECCA LARA, as Personal Representative of the Estate of Gisele Lara, and individually, seek entry of a judgment against each defendant for violation of their Fourteenth Amendment rights secured by 42 U.S.C. § 1983.

### COUNT VI – FAILURE TO TRAIN – VIOLATION OF EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT – 42 U.S.C. § 1983
(As to MS. SECOY, CHIEF BENNETT, and the BOARD OF REGENTS)

286. Plaintiff, REBECCA LARA, as Personal Representative of the Estate of GISELE LARA, and individually, reallege paragraphs 1 through 118 as if fully stated herein.

287. At all times material herein, MS. SECOY had final policymaking authority by way of her official capacity as the Title IX Compliance Coordinator who was acting under color of state law and who, on information and belief, engaged in policy making to supervise and control all policies, practices, rules, guidelines, customs and regulations regarding the Title IX office and its interaction with students.

288. At all times material herein, CHIEF BENNETT had final policymaking authority by way of her official capacity as Chief of Police for the CSU police. She acted under color of state law and who, on information and belief, engaged in policy making to supervise and control all policies, practices, rules, guidelines, customs and

regulations regarding the CSU campus police department and its interaction with students.

289. At all times material hereto, MS. SECOY, CHIEF BENNETT, and the BOARD OF REGENTS were responsible for monitoring and overseeing Title IX compliance at the University, to include coordination of training, education, communications, and administration of grievance procedures for faculty, staff, students and other members of the University community.

290. At all material times, MS. SECOY, CHIEF BENNETT, and the BOARD OF REGENTS had duties to train, but failed to properly or sufficiently train their officials, administrators, employees, agents, staff, students and parents with regard to, among other things, stalking, abuse, intimidation, sexual misconduct, sexual harassment or gender based discrimination; rights, remedies, duties, requirements and obligations under Title IX; recognizing and identifying the warning signs of abusive behavior; investigating, reporting and remedying the effects of sexual harassment and gender based discrimination against students like MS. LARA; properly responding to and remediating continued sexual harassment, sexual battery, and gender based discrimination occurring on its campus and specifically directed towards students like MS. LARA after such as been reported; gender-based stereotypes and the clearly established rights, remedies, duties, requirements and obligations under the equal protection clause of the Fourteenth Amendment.

291. Prior to and up to the time of MS. LARA's murder, MS. SECOY, CHIEF BENNETT, and the BOARD OF REGENTS failed to properly train the officials, administrators, employees, agents, staff, students and parents despite the plainly obvious need for training with regard to, among other things, stalking, abuse, intimidation, sexual misconduct, sexual harassment or gender based discrimination; rights, remedies, duties, requirements and obligations under Title IX; recognizing and identifying the warning signs of abusive behavior; investigating, reporting and remedying the effects of sexual harassment and gender based discrimination against students like MS. LARA; properly responding to and remediating continued sexual harassment and gender based discrimination occurring on its campus and specifically directed towards students like MS. LARA after such as been reported; gender-based stereotypes and the rights, remedies, duties, requirements and obligations under the equal protection clause of the Fourteenth Amendment.

292. Numerous authorities, including the U.S. Supreme Court and U.S. Department of Education, made clear and gave notice to MS. SECOY, CHIEF BENNETT, and the BOARD OF REGENTS that CSU was obligated to confront sexual harassment and abuse directed toward students with regularity, given the high predictability, recurrence and prevalence of sexual assault, harassment and abuse on university campuses and on CSU's campus. Thus, it was foreseen and inevitable that BOARD OF REGENTS and/or CSU officials, officials, administrators, staff,

employees, agents, students and parents would encounter recurrent situations involving sexual abuse that implicated students' Constitutional and federal rights, and it did, in fact, encounter those recurring situations.

293. Through the failure to train officials, administrators, staff, employees, agents, students and parents, MS. SECOY, CHIEF BENNETT, and the BOARD OF REGENTS, through its member university CSU, had a policy, practice and custom of deliberate indifference to the rights of students like MS. LARA. The lack of training left CSU and its officials unequipped to prohibit or discourage readily foreseeable conduct, despite the clearly established and well known dangerous of sexual harassment, domestic violence and dating violence on university campuses and on CSU's campus in particular.

294. As a result, the BOARD OF REGENTS, MS. SECOY, and CHIEF BENNETT subjected MS. LARA to the deprivation of her constitutional right to equal protection under the Fourteenth Amendment and of her federal civil rights under Title IX.

295. The BOARD OF REGENTS, CHIEF BENNETT, and MS. SECOY's failure to train its officials, administrators, employees, agents, staff, students and parents effectively denied MS. LARA's clearly established federal statutory and constitutional legal rights.

296. The failure to train officials, administrators, staff, students and parents was deliberate, reckless, grossly negligent, and in callous indifference to MS. LARA's federally protected rights.

297. As a direct and proximate result of the BOARD OF REGENTS', MS. SECOY's, and CHIEF BENNETT's actions, inactions, and deliberate indifference to and violation of MS. LARA's clearly established Constitutional and federal rights, MS. LARA suffered injuries, including but not limited to emotional distress, psychological trauma, severe physical harm and death.

298. To the extent that CHIEF BENNETT, MS. SECOY, and employees or agents of the BOARD OF REGENTS, including through its member university, CSU, had final policymaking authority, knowledge obtained by such employees or agents is imputed to the BOARD OF REGENTS and to other employees or agents of the BOARD OF REGENTS and/or CSU with final policy making authority.

299. CHIEF BENNETT, MS. SECOY, and the BOARD OF REGENTS, through its member university, CSU, are independently liable for actions they took or failed to take in light of the knowledge that was imputed to them.

300. The actions of the defendants targeted by this Count showed willful misconduct, malice, fraud, wantonness, oppression, and/or an entire want of care which would raise the presumption of conscious indifference to consequences.

301. As a direct and foreseeable consequence of the above-pled misconduct, MS. LARA was stalked, harassed, shot, and then killed.

302. As a further direct and foreseeable consequence of the above-pled misconduct, Plaintiff is entitled to all damages allowable under law, such as:

    a. in a survival action, including but not limited to those for MS. LARA's pre-death physical and mental pain and suffering, in addition to punitive damages;

    b. in a wrongful death action, including but not limited to the full value of MS. LARA's life in both its economic value (e.g., medical expenses, funeral/burial expenses, lost income and earning potential, lost educational opportunities, loss of household services, etc.) and the value of other non-economic intangible things that she would have attained or experienced through the end of her life had she lived) without deducting for any of the necessary or personal expenses of the decedent had she lived, as well as punitive damages;

    c. for loss of REBECCA LARA's relationship with her daughter, MS. LARA, the decedent, including but not limited to emotional loss, mental pain and suffering, the absence of love, society, care, guidance, companionship, counsel, association, comfort, and support, as well as punitive damages;

    d. reasonable and related expenses associated with this lawsuit;

    e. attorneys' fees, 28 U.S.C. § 1988; and,

    f. pre- and/or -post-judgment interest.

WHEREFORE, Plaintiff, REBECCA LARA, as Personal Representative of the Estate of Gisele Lara, and individually, seek entry of a judgment against the BOARD OF REGENTS, MS. SECOY, and CHIEF BENNETT for their violations of the obligation to train, a violation of the Equal Protection Clause of the Fourteenth Amendment as guaranteed by 42 U.S.C. § 1983.

### COUNT VII – UNCONSTITUTIONAL POLICY/POLICY LIKELY TO RESULT IN CONSTITUTIONAL DEPRIVATION – SUPERVISORY LIABILITY FOR VIOLATION OF EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT – 42 U.S.C. § 1983
(As to CHIEF BENNETT)

303. Plaintiff, REBECCA LARA, as Personal Representative of the Estate of GISELE LARA, and individually, realleges paragraphs 1 through 118 as if fully stated herein.

304. As the University Chief of Police for the CSU Police Department prior to and during August 2023, CHIEF BENNETT promulgated, created, implemented, maintained, and/or was responsible for unconstitutional policies or customs that required or encouraged subordinates to respond to reports of sexual harassment, stalking, or sexual battery with deliberate indifference based on gender stereotypes.

305. CHIEF BENNETT violated MS. LARA's right to equal protection when she promulgated, created, implemented, maintained, and/or was responsible for these unconstitutional policies or customs and when her subordinates treated MS. LARA in accordance with these unconstitutional policies or customs.

306. CHIEF BENNETT promulgated, created, implemented, maintained or were responsible for policies or customs that she knew or should have known were likely to result in deliberate indifference to reports of sexual harassment, in treatment based on gender stereotypes and the risk in that regard was a plainly obvious consequence of such policies or customs.

307. Indeed, among other things, CHIEF BENNETT promulgated, created, implemented, maintained and/or was responsible for policies or customs that required or encouraged subordinates to, among other things: ignore reports of sexual harassment or rape; ignore assignments to investigate reports of sexual harassment; respond to reports of sexual harassment in an untimely manner; investigate reports of sexual harassment in an untimely manner; investigate victims, but not their harassers; ignore information that could be obtained by checking a harasser's parole status; intimidate victims of sexual harassment; treat victims of sexual harassment with hostility and disdain; minimize reports of sexual harassment; respond to sexual harassment in a flippant manner; express disinterest in the harassment; blame victims for the harassment; accuse victims of lying about the harassment; otherwise

discourage women from reporting harassment or from taking action against their harassers; refuse requests to obtain or preserve forensic evidence; and ignore laws that require law enforcement to provide victims of sexual harassment with information about their rights and the resources available to them.

308. CHIEF BENNETT promulgated, created, implemented, maintained, and/or were responsible for unconstitutional policies or customs of failing to immediately seek out and detain or question CSU students formally reported for rape, stalking, and/or sexual harassment on campus.

309. CHIEF BENNETT had a duty to promulgate, create, implement, maintain and enforce policies necessary to ensure that subordinates clearly understood their obligation to, among other things: recognize reports of sexual harassment, rape and/or stalking; recognize the common warning signs associated with such behavior; assess the degree of risk associated with reports of sexual harassment; respond to reports of sexual harassment in a timely and appropriate manner; recognize common gender stereotypes, set aside personal bias while acting under color of state law and otherwise comply with Title IX and respect equal protection rights under the constitution.

310. CHIEF BENNETT knew or should have known that subordinates had an unconstitutional custom of responding to reports of sexual harassment with deliberate indifference and of treating women based on gender stereotypes.

311. The failure to promulgate, create, implement or enforce policies as set forth above otherwise caused subordinates to be deliberately indifferent to MS. LARA's reports of sexual harassment, rape, and/or stalking despite the report coming through faculty, and the failure caused CSU police to treat MS. LARA based on gender stereotypes and caused them to decline or delay investigation of a report of serious rape, sexual harassment, and/or stalking by one CSU student of another on campus.

312. The actions of the defendants targeted by this Count showed willful misconduct, malice, fraud, wantonness, oppression, and/or an entire want of care which would raise the presumption of conscious indifference to consequences.

313. As a direct and foreseeable consequence of the above-pled misconduct, MS. LARA was stalked, harassed, shot, and then killed.

314. As a further direct and foreseeable consequence of the above-pled misconduct, Plaintiff is entitled to all damages allowable under law, such as:

    a. in a survival action, including but not limited to those for MS. LARA's pre-death physical and mental pain and suffering, in addition to punitive damages;

    b. in a wrongful death action, including but not limited to the full value of MS. LARA's life in both its economic value (e.g., medical expenses, funeral/burial expenses, lost income and earning potential, lost

educational opportunities, loss of household services, etc.) and the value of other non-economic intangible things that she would have attained or experienced through the end of her life had she lived) without deducting for any of the necessary or personal expenses of the decedent had she lived, as well as punitive damages;

c.  for loss of REBECCA LARA's relationship with her daughter, MS. LARA, the decedent, including but not limited to emotional loss, mental pain and suffering, the absence of love, society, care, guidance, companionship, counsel, association, comfort, and support, as well as punitive damages;

d.  reasonable and related expenses associated with this lawsuit;

e.  attorneys' fees, 28 U.S.C. § 1988; and,

f.  pre- and/or -post-judgment interest.

WHEREFORE, Plaintiff, REBECCA LARA, as Personal Representative of the Estate of Gisele Lara, and individually, seeks entry of a judgment against CHIEF BENNETT for her violations of law as guaranteed by 42 U.S.C. § 1983.

## COUNT VIII – INTEREST ON MONEY JUDGMENT
(Against All Defendants)

315. Plaintiff, REBECCA LARA, as Personal Representative of the Estate of GISELE LARA, and individually, realleges paragraphs 1 through 118 as if fully stated herein.

80

316. As a proximate result of Defendants' violation of Title IX and Defendants' deprivation of Plaintiffs' rights to equal protection under the Fourteenth Amendment, Plaintiffs suffered injuries and incurred damages.

317. Pursuant to federal law, Plaintiffs are entitled to receive pre-judgment interest from the date of the incident on all damages that have been or will be incurred as a result of their injuries as an element of complete compensation.

318. Pursuant to 28 U.S.C. §1961, Plaintiffs are entitled to receive interest from the date of the entry of judgment on all damages awarded pursuant to such judgment.

319. The amount related to interest on money judgment that Plaintiffs sustained as a proximate result of Defendants' acts or omissions will be proven at trial.

WHEREFORE, Plaintiff prays for judgment against all Defendants for all interest due on any recovery under any other count in the Complaint.

## COUNT IX – RECOVERY OF OCGA § 13-6-11 EXPENSES
(As to All Defendants)

320. Each Defendant acted in bad faith, has been stubbornly litigious, or has caused the Plaintiffs unnecessary trouble and expense, in a manner that will be further proven at trial, such that Plaintiffs are entitled to recover attorneys' fees and litigation expenses pursuant to OCGA § 13-6-11.

321. Each Defendant and/or its agents had knowledge of the facts and circumstances of Plaintiffs' injuries and/or death.

322. Each Defendant and/or its agents denied all responsibility for Plaintiffs' injuries and/or death prior to the filing of this lawsuit.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

## SIGNATURE OF ATTORNEY

Per Fed. R. Civ. P. 5(d)(1)(B), Rule 11, and LR 5.1, NDGa, the undersigned has electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

Dated this 12th day of August, 2025

*/s/ Jordan Redavid, Esq.*
**JORDAN REDAVID, ESQ.**
Georgia Bar No. 628049
*Lead Counsel for Plaintiffs*

**FISCHER REDAVID PLLC**
Global Mailing Address:
510 Shotgun Road
Suite 110
Sunrise, FL 33326
Phone: (954) 860-8434
GAService@YourChampions.com
Jordan@YourChampions.com
Crystal@YourChampions.com