UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

REBECCA LARA,

      Plaintiff,

    v.

BOARD OF REGENTS OF THE
UNIVERSITY SYSTEM OF
GEORGIA, et al.,

      Defendants.

CIVIL ACTION NO.
1:25-CV-04560-JPB

## ORDER

This matter comes before the Court on Michael Newbrey, Laura Bennett,

Sarah Secoy and the Board of Regents of the University System of Georgia's

("Defendants") Motion to Dismiss [Doc. 10].  The Court finds as follows:

## BACKGROUND

### A.  Facts[1]

This case arises from the tragic death of Gisele Lara.  In August 2022,

Gisele began attending classes at Columbus State University ("CSU") in

Columbus, Georgia.  [Doc. 1, p. 15].  Gisele was enrolled in a biology class taught

by Defendant Newbrey.  Id.  During the summer of 2023, Gisele participated in

---

[1] The following facts are taken from the Complaint and are accepted as true for purposes of resolving the Motion to Dismiss.

fish research trips led by Defendant Newbrey.  Id.  Another student who took part in these trips was Nate Janik.  Id. at 2, 15.  According to the Complaint, "[a]t some time during the summer of 2023, [Janik] raped [Gisele]."  Id. at 15.  After the rape, Gisele "attempted to distance herself" from Janik "but his advances continued."  Id.

During the Fall 2023 semester, Gisele and Janik had another class together.  Id. at 15–16.  The students in the class were split into research groups, and Janik wanted to be in the same research group as Gisele.  Id.  Gisele was concerned about this, so she "began to communicate" with Defendant Newbrey about her concerns.  Id. at 16.  She reported Janik's harassing behavior to Defendant Newbrey on August 14, 2023.  Id.  Defendant Newbrey promised that Janik would be "nowhere near" Gisele and said that he was making Janik switch to a different research group.  Id. at 17.

The next day, Janik followed Gisele to her car after class.  Id.  The day after that, August 16, 2023, a security camera showed Janik stalking Gisele.  Id.  Gisele had a male teaching assistant escort her to class that morning because she was afraid of Janik.  Id.  Later that day, Gisele met with her boyfriend for lunch and told him that Janik was scaring her and that she was uncomfortable being around him in class.  Id.  Around noon, Gisele and her boyfriend went to speak to

Defendant Newbrey about Janik.  Id.  Gisele informed Defendant Newbrey that she did not feel comfortable being around Janik or working on a research project with him.  Id.  She also told Defendant Newbrey that Janik "had raped and/or sexually assaulted her previously."  Id. at 18.  She further informed him that Janik was "continuing to stalk and sexually harass her."  Id.  After this conversation, Gisele's boyfriend spoke to Defendant Newbrey alone to reiterate that Gisele had been raped and to ensure that Defendant Newbrey would report everything Gisele had said to CSU's Title IX office.  Id.  At 5:47 PM that evening, Defendant Newbrey submitted a "Create Care" report—a form that CSU used for reporting threatening behavior.  Id.  The report was submitted to the Assistant Dean of Students; the Title IX Coordinator, Defendant Secoy; the University Chief of Police, Defendant Bennett; and "all Campus Security Officials" with "authority to act immediately." Id.

According to the Complaint, "no one at CSU took any actions" to support Gisele or to "implement or develop a plan for safety measures" after the report was submitted.  Id.  The next day, August 17, 2023, Defendant Secoy sent Gisele a "form email" suggesting that the two could schedule a meeting to discuss Defendant Newbrey's report, but all the times she suggested for a meeting conflicted with Gisele's class schedule.  Id. at 19.  The email also said that

"support services may be available" but did not explain what those services were. Id.  Ultimately, Defendant Secoy did not schedule a meeting with Gisele.  Id.

That evening, Janik again followed Gisele to her car after one of her classes. Id.  This time he exhibited threatening behavior, including "banging on her car window."  Id.  Janik was not enrolled in the class that Gisele was leaving, which, according to the Complaint, demonstrates that he was "surveilling" Gisele and that the threat he posed was increasing.  Id. at 19–20.  Despite the threat, at some point both Defendant Secoy and Defendant Newbrey informed Janik that Gisele had made requests for accommodations and safety measures.  Id. at 20.

Gisele was so distressed that she was "terrified to go to class" on August 18. Id.  Still, she went to class that day.  Before class began, multiple witnesses saw Gisele and Janik "having an altercation."  Id.  Defendant Newbrey also observed Gisele and Janik having an altercation outside of a class building.  Id.  He did not intervene or request campus police.  Id.  Another CSU employee and a student also witnessed this "heated" verbal altercation.  Id.

After this altercation, Gisele and Janik "returned to class five minutes late," and Defendant Newbrey thought they "appeared distressed" and upset.  Id. at 21. Defendant Newbrey said that Janik was "wide-eyed."  Id.  Another student in the class reported that Janik was repeatedly looking back at Gisele throughout the

4

class.  Id.  Though it is unclear exactly when, the Complaint alleges that Janik told Gisele that she "needed to date him" and that he would "kill himself in front of the whole class."  Id.

When class ended, Janik followed Gisele as she exited the classroom and followed her all the way to her car in the parking lot.  Id.  Janik then confronted Gisele with a firearm and "levied accusations that she had been cheating on him."  Id.  Gisele repeatedly asked Janik to "stop" and to "leave her alone."  Id.  At that point, Janik shot and killed Gisele.  Id. at 22.  He then inflicted a fatal gunshot wound on himself.  Id.

## B.  Procedural History

Rebecca Lara ("Plaintiff"), Gisele's mother, initiated this action on August 12, 2025.  [Doc. 1].  She brings suit in both her individual capacity and as the personal representative of Gisele's estate.  Id. at 24.  Plaintiff brings nine claims against Defendants:  three counts under Title IX for Deliberate Indifference (Counts I–III), four counts under 42 U.S.C. § 1983 for violations of the Fourteenth Amendment (Counts IV–VII), a count for interest on money judgment (Count VIII) and a count for recovery of litigation expenses under Georgia law (Count IX).  Id. at 27–82.

On October 13, 2025, Defendants filed a Motion to Dismiss [Doc. 10].

Defendants seek dismissal of Counts II–VII.  Id.; [Doc. 16, p. 3].  Plaintiff filed a

response in which she concedes that her Title IX claims in Counts II and III should

be dismissed entirely. [Doc. 15, pp. 2–3].  Accordingly, those counts are hereby

**DISMISSED**.  Plaintiff also concedes that her § 1983 claims in Counts V and VI

should be dismissed as to the Board of Regents.  Id. at 3.  Thus, those counts are

also **DISMISSED** as to the Board of Regents alone.

Plaintiff opposes dismissal of the other challenged claims, and the motion to

dismiss as to those claims is now ripe for review.

## LEGAL STANDARD

In evaluating a motion to dismiss under Federal Rule of Civil Procedure

12(b)(6), the court "accept[s] the allegations in the complaint as true and

constru[es] them in the light most favorable to the plaintiff."  Traylor v. P'ship

Title Co., LLC, 491 F. App'x 988, 989 (11th Cir. 2012).  Federal Rule of Civil

Procedure 8(a)(2) provides that a pleading must contain "a short and plain

statement of the claim showing that the pleader is entitled to relief."  Although

detailed factual allegations are not necessarily required, the pleading must contain

more than "labels and conclusions" or a "formulaic recitation of the elements of a

cause of action."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  A complaint is

insufficient if it only tenders naked assertions devoid of further factual enhancement.  Id.  Importantly, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. (citation omitted).  At bottom, the complaint must contain more than "an unadorned, the defendant-unlawfully-harmed-me accusation," and must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  While all well-pleaded facts must be accepted as true and construed in the light most favorable to the plaintiff, a court need not accept as true the plaintiff's legal conclusions, including those couched as factual allegations.  Id.

Accordingly, evaluation of a motion to dismiss requires two steps:  (1) a court must eliminate any allegations in the pleading that are merely legal conclusions, and (2) where there are remaining well-pleaded factual allegations, a court must "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.

## DISCUSSION

### A.  Monell Liability (Count V)

To begin, Plaintiff has conceded that Count V should be dismissed as to the Board of Regents, but she expressly preserved it as to the individual Defendants.

7

[Doc. 15, p. 3].  This Count, however, is labelled as a claim for <u>Monell</u> liability.

[Doc. 1, p. 63].  As Defendants point out, <u>Monell</u> liability allows a municipal

corporation to be held liable for the actions of its employees if they acted pursuant

to a policy or custom that violates constitutional rights.  [Doc. 16, p. 4].  The

individual Defendants, however, are not municipalities and thus cannot be held

liable on the basis of <u>Monell</u>.  Plaintiff never argues otherwise.[2]  Because this

claim cannot proceed against individual defendants, it is hereby **DISMISSED**.

## B.  Qualified Immunity

Defendants argue that the remaining § 1983 claims in Counts IV, VI and VII

should be dismissed on the basis of qualified immunity.  <u>See</u> <u>Kirby v. Sheriff of</u>

<u>City of Jacksonville</u>, No. 22-11109, 2023 WL 2624376, at *3 (11th Cir. Mar. 24,

2023) ("A defendant can assert the defense of qualified immunity . . . in a pretrial

motion to dismiss for failure to state a claim under Rule 12(b)(6).").  Generally,

when government officials, like police officers, are performing discretionary

duties, they are entitled to qualified immunity.  <u>Edger v. McCabe</u>, 84 F.4th 1230,

1235 (11th Cir. 2023).  "A plaintiff may rebut this entitlement by showing that the

government officials (1) committed a constitutional violation; and (2) that this

---

[2] Indeed, Plaintiff appears to conflate this count with Count IV in its entirety.  [Doc. 15, pp. 4–12].  To the extent Count V was a standalone claim based on a different theory of liability, Plaintiff does not defend it on that ground.

violation was 'clearly established' in law at the time of the alleged misconduct." Id. (citing Pearson v. Callahan, 555 U.S. 223, 232 (2009)).  "[I]f a plaintiff fails either prong of the qualified immunity analysis, his claim is barred."  Id.

Here, Plaintiff "fully agrees" that the individual Defendants were acting within their discretionary authority.  [Doc. 15, p. 3].  The Court does too.  The individual Defendants' positions with the Board of Regents involved reporting and responding to instances of sexual assault or training other employees on how to respond to those reports.  These were legitimate job-related functions, thus the threshold inquiry for triggering qualified immunity is satisfied.

The parties disagree about whether the Complaint adequately alleges a violation of clearly established constitutional rights to overcome qualified immunity at this stage.  The Court will analyze the arguments as to each claim below.

**1. Disparate Treatment and Deliberate Indifference (Count IV)**

The "Equal Protection Clause confers a federal constitutional right to be free from sex discrimination," which is applicable to claims of sexual discrimination on a university campus.  Williams v. Bd. of Regents of the Univ. Sys. of Georgia, 477 F.3d 1282, 1300–01 (11th Cir. 2007) (citing Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 273 (1979)).  Plaintiff's Complaint alleges that this right was violated

9

because the individual Defendants "did not respond" to Gisele's report "the way that they would have responded to a claim by a male student of being harassed, attacked, or threatened."  [Doc. 1, p. 61].

Defendants argue that these allegations are conclusory.  [Doc. 10-1, p. 13]. They say that the factual allegations are simply insufficient to draw a reasonable inference that Gisele was treated differently from a similarly situated individual as required by the Equal Protection Clause.  Id.  Plaintiff responds that her allegations are sufficiently specific to survive a motion to dismiss.  [Doc. 15, p. 6].

To state a claim under the Equal Protection clause of the Fourteenth Amendment, a plaintiff typically must plead that (1) she is similarly situated to other persons who received more favorable treatment, and (2) her discriminatory treatment was based on a constitutionally protected interest such as race or gender. Rondini v. Bunn, No. 7:17-CV-01114, 2018 WL 317713, at *8 (N.D. Ala. Jan. 8, 2018).  A plaintiff must also allege that the defendant acted with the intent to discriminate; conclusory allegations of personal belief of disparate treatment are insufficient to state a claim.  Id.

Here, Plaintiff has not adequately alleged that any of the individual Defendants acted with an intent to discriminate against her.  Allegations that Defendants "classified [Gisele] by her gender" and that they "engaged in

10

differential treatment" are conclusory.  [Doc. 1, p. 60].  The Complaint alleges that

Defendants "based their decisions" on a long list of gender stereotypes, id. at 59–

60, but again, there are no specific factual allegations that raise an inference that

these were truly the Defendants' motives.  Likewise, the Complaint lacks specific

factual allegations about similarly situated individuals that were treated more

favorably than Gisele—other than a conclusory statement that Defendants "would

have responded to a claim by a male student" in a different way.  Id. at 61.

Ultimately, to survive a motion to dismiss, a plaintiff must allege specific

facts that give rise to a plausible inference that she is entitled to relief.  Iqbal, 556

U.S. at 678.  Plaintiff has not alleged anything more than conclusory facts as to

discriminatory intent and to the existence of similarly situated individuals that were

treated better.  Without specific factual allegations supporting these elements,

Plaintiff has failed to state a claim under a disparate treatment theory.

Plaintiff argues, however, that her equal protection claim can still proceed on

a deliberate indifference theory.  Under this theory, a "government official may be

held liable under [§] 1983 upon a showing of deliberate indifference to known

sexual harassment."  Hill v. Cundiff, 797 F.3d 948, 978 (11th Cir. 2015) (citation

modified).  To state a claim, a plaintiff must allege that the defendant "actually

knew of and acquiesced in the discriminatory conduct."  Id.

11

Here, it is not disputed that the individual Defendants each had actual knowledge of Janik's sexual harassment and stalking behavior.  Defendants argue, however, that they did enough in response to Gisele's disclosures to avoid acquiescing in the discriminatory conduct.  [Doc. 16, p. 7].  Specifically, Plaintiff contends that Defendant Newbrey reported the harassment; Defendant Secoy sought to schedule a meeting with Gisele; and Defendant Bennett was only copied on the Report.  Id.  These factual allegations, Defendants say, undermine the plausibility of an equal protection claim based on a deliberate indifference theory. Id. at 7–8.

The Court disagrees.  Construing the allegations and all inferences arising therefrom in favor of Plaintiff, there is a plausible claim against each individual Defendant based on deliberate indifference to known sexual harassment.  Despite the urgent nature of Gisele's disclosure, Defendant Newbrey waited until the end of the day to submit a report.  [Doc. 1, p. 18].  And though he submitted a report, he also saw Gisele and Janik in his class two days later.  Id. at 20–21.  He took no further action when he saw the two of them in a heated argument before class, despite knowing what Gisele had told him about Janik's violence towards her.  Id. And despite Defendant Newbrey's report being marked as "Critical," Defendant Secoy's only action was to send a generic email to Gisele suggesting that they

could schedule a meeting together.  Id. at 19.  Defendant Secoy's email referred to the fact that "support services may be available" but did not explain what those sources were or contain any contact or website information for the Title IX office or the CSU police department.  Id.  And Defendant Bennett's lack of action on August 17 does not help her.  She received a report that a student had been raped and was actively being stalked, yet according to the Complaint, the university police took no steps to respond to the report of very serious and ongoing crimes.  Id. at 18.  Taken together, the Court finds that these facts and the inferences from them plausibly allege that the individual Defendants acquiesced in discriminatory conduct.

Defendants next argue that, to establish deliberate indifference, there must be "proof that a municipal actor disregarded a known or obvious consequence of his action [or inaction]."  [Doc. 16, p. 6] (quoting).  This argument conflates different legal standards, however.  This proof is required when a *municipal* actor is at issue—in Hill, this standard was applied to a school board.  Hill, 797 F.3d at 977.  When the Hill court addressed a deliberate indifference claim against an *individual*, however, it did not apply this standard.  Id. at 978.  Instead, the Court simply analyzed whether there was a plausible claim that the defendant had acquiesced in discriminatory conduct and then whether qualified immunity

13

applied.  Id.; see also A.P. v. Fayette Cnty. Sch. Dist., No. 21-12562, 2023 WL 4174070, at *10 (11th Cir. June 26, 2023) (describing the deliberate indifference standard for "a municipal official's individual liability" as "similar[]" to that for a municipality, but noting the distinction drawn in Hill).  This count is brought against the individual Defendants alone, so the "known or obvious consequence" analysis does not apply here.[3]

Thus, the Court now turns to the second qualified immunity inquiry, whether there is a violation of a clearly established constitutional right.  A constitutional right can be clearly established in one of three ways:  "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statue, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." Lewis v. City of W. Palm Beach, 561 F.3d 1288, 1291–92 (11th Cir. 2009) (citations omitted).

---

[3] Even if the "known or obvious consequence" requirement applied here, the Court would find that it is satisfied.  Defendants' argument on this point is that they did enough to respond to the harassment by filing a report and sending Gisele an email. [Doc. 16, pp. 7–8].  As explained above, Plaintiff has plausibly stated a claim of deliberate indifference even with this conduct on Defendants' part.  Moreover, the Court finds that the risk of escalating violence, including murder, is an obvious consequence when authorities take insufficient steps to respond to a report that a student was raped, that she still shared a class with the rapist and that she was actively being stalked by the rapist.

Defendants contend that "the broad principle that sexual harassment may violate an individual's Equal Protection rights . . . is insufficient" under this test. [Doc. 16, p. 10]. But the Eleventh Circuit has held the opposite, especially in situations where Defendants do "virtually nothing in response" to reports of sexual harassment. Hill, 797 F.3d at 978; see also id. at 979 (concluding that official "would not have believed doing nothing was lawful in light of the clearly established principle that deliberate indifference to sexual harassment is an equal protection violation" (citing Doe v. Sch. Bd. of Broward Cnty., Fla., 604 F.3d 1248, 1261 (11th Cir. 2010) (finding deliberate indifference when the principal "effectively did nothing" in response to sexual harassment)). The Court agrees with these authorities that there is a clearly established equal protection right to be free from deliberate indifference to sexual harassment.

For the foregoing reasons, the Court finds that Plaintiff has failed to state a claim under Count IV on a disparate treatment theory and such a claim is **DISMISSED**. Count IV may **PROCEED**, however, on a deliberate indifference theory because, under that theory, Plaintiff has plausibly alleged a violation of a clearly established constitutional right, and qualified immunity thus does not apply at this stage.

### 2. Failure to Train and Failure to Supervise (Count VI)

To establish a failure-to-train claim under § 1983, the plaintiff must show (1) that the existing training program is inadequate; (2) that adequate training would have prevented the injury; and (3) that the supervisor's failure to adequately train the employees amounts to deliberate indifference to the rights of persons with whom the employees come into contact. Massey v. Dorning, 611 F. Supp. 3d 1301, 1323 (N.D. Ala. 2020). Deliberate indifference requires that "the supervisor had actual or constructive notice that a particular omission in the training program" caused the injury, and that the supervisor still "chose to retain that training program." Id. (quoting Keith v. DeKalb Cnty., 749 F.3d 1034, 1052 (11th Cir. 2014)). Ordinarily, "a pattern of similar constitutional violations by untrained employees" is necessary to establish actual or constructive notice. Id. (quoting Keith, 749 F.3d at 1053). But in some circumstances, the consequences of failing to train employees may be "so obvious, and the inadequacy so likely to result in the violation of constitutional rights," that pointing to a pattern of similar violations is unnecessary. Id. (quoting City of Canton v. Harris, 489 U.S. 378, 390 (1989)).

As with the disparate treatment theory discussed above, Defendants argue that Plaintiff has not alleged sufficient facts to plausibly state a claim for failure to train. [Doc. 10-1, pp. 15–16]. The Court agrees with Defendants. Plaintiff's

16

Complaint alleges that Defendants Secoy, Bennett and the Board of Regents had duties to train employees on how to respond to various kinds of sexual misconduct toward students.  [Doc. 1, p. 71].  But without providing additional facts, the Complaint simply asserts that these Defendants "failed to properly or sufficiently train" the relevant employees and that this failure led to Gisele's death.  Id. at 71–72.  Plaintiff offers no facts about the existing training program, which makes it impossible for her to show how that program was inadequate or how the inadequacy could so obviously lead to a violation of constitutional rights.  In short, the conclusory allegations fail to plausibly state a claim.  Accordingly, Plaintiff's failure-to-train claim is **DISMISSED**.

This count also includes a failure to supervise claim.  The standard for a failure to supervise claim is the same as a failure to train claim.  Massey, 611 F. Supp. 3d at 1324.  A plaintiff must plead (1) that the defendant failed to supervise its employees; (2) that adequate supervision would have prevented the injury; and (3) that the failure to supervise amounts to deliberate indifference.  Id.

The allegations in the Complaint do not plausibly support this claim either. The Complaint does not identify who should have been supervised or how adequate supervision would have prevented the injury at issue.  It merely relies on conclusory assertions that employees were inadequately trained.  [Doc. 1, pp. 71–

17

72]. This is not enough to state a claim, and as a result, this claim is also

**DISMISSED**.

### 3. Supervisory Liability (Count VI & Count VII)

It is well established in this Circuit that supervisory officials are not liable

under § 1983 for the unconstitutional acts of their subordinates on the basis of

respondeat superior or vicarious liability. Christmas v. Harris Cnty., 51 F.4th

1348, 1355 (11th Cir. 2022). Instead, supervisory liability under § 1983 occurs

either when the supervisor personally participates in the alleged unconstitutional

conduct or when there is a causal connection between the actions of a supervising

official and the alleged constitutional deprivation. Id. There are three ways to

establish a causal connection between a supervisor's actions and the unlawful

conduct: (1) "a history of widespread abuse [that would put the defendants] on

notice of the need to correct the alleged deprivation, and he fails to do so"; (2) that

a "supervisor's custom or policy results in deliberate indifference to constitutional

rights"; or (3) that "facts support an inference that [defendants] directed

subordinates to act unlawfully or knew that the subordinates would act unlawfully

and failed to stop them from doing so." Dickinson v. Cochran, 833 F. App'x 268,

272 (11th Cir. 2020).

These counts of the Complaint appear geared towards the second theory—that Defendants had policies or customs that led to deliberate indifference of Gisele's rights.  [Doc. 1, pp. 70, 76–79].  Opposing this theory, Defendants argue that the facts in support of this claim are conclusory and do not plausibly establish a history of widespread abuse or even the existence of any particular policy or custom.  [Doc. 10-1, pp. 17–22].  The Court agrees that Plaintiff has not alleged specific facts in this regard.  And Plaintiff appears to agree too.  Somewhat confusingly, Plaintiff's response to the motion to dismiss these claims focuses solely on the fact that Defendants personally participated in the constitutional violation; it does not mention policy or custom at all.  [Doc. 15, pp. 18–19].  As discussed above in Count IV, the Court has already found that Plaintiff stated a claim as to the individual Defendants' own actions.  However, to the extent that Counts VI and VII assert claims on a theory of supervisory liability based on policies or customs that violated Gisele's rights, the Court agrees with Defendants that the Complaint's allegations do not state a claim.  As such, these counts are **DISMISSED**.

## C.  Individual Capacity Claims

Plaintiff brought all her claims in both her individual capacity and as the personal representative of Gisele's estate.  Defendants argue that the individual

capacity claims must be dismissed.  They contend that Plaintiff's Title IX claim against the Board of Regents (Count I) cannot be brought in an individual capacity because Title IX creates an implied right of action *for students* to sue.  [Doc. 10-1, p. 24] (citing Joseph v. Bd. of Regents of the Univ. Sys. of Ga., 121 F.4th 855, 866 (11th Cir. 2024)).  They also contend that Plaintiff's § 1983 claim (Count IV) is "entirely personal to the direct victim of the alleged constitutional tort" such that only the victim themselves or the representative of the victim's estate can sue for these claims.  Id.

Plaintiff responds that "[w]here death results from the alleged constitutional violations, the Court looks to state law, in this case Georgia, to determine who can bring claims under 42 U.S.C. § 1983."  [Doc. 15, p. 20] (quoting McClinton v. Berry, No. 5:22-CV-109, 2024 WL 4293012, at *3 (M.D. Ga. Sep. 25, 2024)).  Georgia law provides that certain next of kin may bring wrongful death claims, and Plaintiff cites authority allowing such claims to go forward.  Id. at 20–21.  Notably, Plaintiff does not contest that a Title IX claim is personal and therefore must be brought by the victim or the victim's estate.

In reply, Defendants concede that it is permissible to bring a § 1983 wrongful death claim based on Georgia law, but they point out that Plaintiff does not allege a separate wrongful death claim.  [Doc. 16, pp. 14–15].  Instead, they

20

say, the Complaint only mentions wrongful death in describing damages available under other counts.  Id. at 15.

Defendants are correct.  Case law in this circuit makes clear that, when a constitutional violation results in a death, there are two categories of claims.  There are the claims personal to the decedent that can be brought by the decedent's estate, and there are claims for wrongful death that can be brought by next of kin individually.  See Robertson v. Hecksel, 420 F.3d 1254, 1261 (11th Cir. 2005).  And the Eleventh Circuit has said that § 1983 incorporates the elements of wrongful death claims from state law.  Carringer v. Rodgers, 331 F.3d 844, 849 (11th Cir. 2003).

Here, Count IV asserts a violation of Gisele's equal protection rights.  But this count does not purport to be a wrongful death claim, nor does the Complaint ever set forth the elements of a wrongful death claim under Georgia law.  [Doc. 1, p. 58].  Accordingly, the Court finds that Plaintiff has not brought a separate wrongful death claim that would allow her to proceed individually.  Thus, Plaintiff's individual capacity claims are **DISMISSED**.

**CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss [Doc. 10] is **GRANTED IN PART**.  Counts II, III, V, VI and VII are hereby **DISMISSED**.

21

Count IV is **DISMISSED** to the extent it is based on a disparate treatment theory, but it may **PROCEED** on a deliberate indifference theory.  Plaintiff's claims brought in an individual capacity are also **DISMISSED**, but her remaining claims under Count I and Count IV may **PROCEED** in Plaintiff's capacity as the representative of Gisele's estate.

SO **ORDERED** this 15th day of May, 2026.

J. P. BOULEE
United States District Judge

22